## UNITED STATES v. OLWEISS et al.
### No. 29.

Circuit Court of Appeals, Second Circuit.
Nov. 3, 1943.

Writ of Certiorari Denied Jan. 17, 1944.

See 64 S.Ct. 483.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

Bergner & Bergner, of New York City (I. Maurice Wormser, David Bergner, and Benjamin Poller, all of New York City, of counsel), for appellants Schwarz and Nass.

Ellsworth Baker, of Monticello, N. Y. (M. Richard Tamny, of New York City, of counsel), for appellant Olweiss.

K. Bertram Friedman and James B. M. McNally, U. S. Atty., both of New York City, for appellee.

L. HAND, Circuit Judge.

The three defendants, Olweiss, Schwarz and Nass, appeal from a judgment of conviction for concealing some $17,000 of the assets of Olweiss from his trustee in bankruptcy. The points they raise are that the only competent evidence did not support the

verdict; that the judge committed various errors during the course of the trial and in his charge; and that he improperly forced a verdict, when the jury was unable to agree. To an understanding of these points some statement of the evidence is necessary. Apparently until April 19, 1934—although the exact day is somewhat uncertain—Olweiss, Schwarz and Nass had been conducting a wholesale green grocery business in Liberty, New York, either as co-owners or partners. On that day they signed several papers by which Schwarz and Nass purported to transfer to Olweiss all their interest in the business, and agreed to serve as employees, each at $50, and later at $100, a month. The price fixed in the agreement for their share in the business was $1,000 to be paid by a cheque postdated to August first, and such a cheque Olweiss signed and delivered, apparently not until May 4th. Although as between the parties this transfer may have been genuine, Schwarz and Nass continued as before to supervise and direct the business; there was no outward change in their authority, and from all the evidence the jury might have found that they still retained their former interest in the business. A large part of the stock was kept in a barn in Fallsburg, New York, which they used as a storehouse; and at the end of July a flood entered this building and did some damage to the goods. The amount of this was disputed; the defendant said that the loss was over $15,000; other witnesses that it was very little; on the record we should have accepted the lower estimate, and of course it was in any view a question for the jury. Whatever the amount of that loss, the three kept the business going until August 22 and closed the shop on the 23rd. Olweiss filed a voluntary petition on the 24th; and a trustee was appointed on September 17th, 1934. The value of the goods on hand when the business closed down is uncertain; arguendo, we will accept Olweiss's estimate of $6,000—the highest, and probably much too high. On the 21st Schwarz and Nass cashed the cheque for $1,000 given them in May; and two of the witnesses for the prosecution testified that shortly before this, each had separately taken money from the cash register. In addition, there was testimony that about a week before the bankruptcy they had told a truckman to deliver assorted goods to several hotels; the deliveries being in the evening and no receipts being taken. Another employee, Rosenberg, swore that Nass went along with him on or about the 21st, when he delivered from Fallsburg three full loads of a two and a half ton truck to a hotel which also gave no receipt. He had never before used a truck of larger capacity than half a ton. (Olweiss's books contained no entries of any of these deliveries.)

In addition to this testimony the prosecution put in evidence the computation of an accountant from the Federal Bureau of Investigation, made from Olweiss's books for the period beginning April eleventh. From this it appeared that there had been purchases of nearly $95,000 and an unaccounted shortage of about $26,800. Since, however, the accountant had included debts of $1,500, on the evidence only of proofs of claims in bankruptcy, so much should be deducted, reducing the shortage to about $25,000. If we allow $6,000 as the value of the assets on hand at the bankruptcy, the discrepancy becomes $19,000. The accused objected to the competency of this computation; they argued that it was vitiated by the fact that in making it the accountant had used other documents than Olweiss's books, and that he had assumed that the goods had been sold at a profit of seven and a half per cent. As to the first, the accountant swore that the proofs of claim already mentioned were the only documents outside the books which he had used; and we have just made the necessary correction for that. As to the second, Olweiss on the stand gave testimony from which the jury was justified in finding that he sold at an even higher profit than seven and a half per cent. With this as a foundation the computation was clearly competent, since without some such assistance the books of account are altogether unintelligible to a jury. The books themselves were obviously competent against Olweiss personally; and Schwarz and Nass had been shown to have had so intimate a relation to the business— even assuming that they were only employees—that they were competent against them as well. Once the flood loss was eliminated, the computation became substantially incontrovertible proof of guilt. Taking the evidence as a whole, it is difficult to see how any jury could have failed to convict all three of the accused.

The chief objection being so disposed of, we proceed to the supposed errors during the course of the trial. Schwarz and Nass complain that although they were

not indicted for conspiracy, they were convicted as accomplices of Olweiss, and upon evidence admissible only against him. It was proper to charge them as principals—which they probably were in any event—even though they were only accessories. (§ 550, Title 18, U.S.C.A.); and any evidence admissible against Olweiss was admissible against them, so far as it consisted of conduct in furtherance of the joint venture in which all three were engaged. The notion that the competency of the declarations of a confederate is confined to prosecutions for conspiracy has not the slightest basis; their admission does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal. No other objections to the admission of any of the evidence need detain us; most of them were not raised at the trial, and those that were are trivial.

■ We come next to the charge. At some time, how long does not appear, before he began his colloquial charge the defendants handed to the judge fifty-four requests. Perhaps he would have been within his powers to disregard all of them, when presented in such number; at best the practice is exceedingly undesirable. When a judge has described the liability correctly in his colloquial charge, the jury will usually get whatever it does get at that time. Abstract propositions of law, delivered staccato, as part of a later colloquy between him and the bar are of very slight importance; they tend rather to confuse than to enlighten a jury; and, indeed, when asked in such quantity as these, are often intended only to confuse the judge. Be that as it may, in the case at bar the record contains nothing to indicate that the defendants complained at the time of the judge's refusal of their requests as a whole. At the conclusion of his charge they singled out about a dozen on which he did rule; and it is pretty clear that these were the only ones that they meant to rely on. Further the only ones of these, to his rulings on which they indicated any objection, were the fourteenth and fifteenth; and he conformed nearly enough to what they had asked in these for all practical purposes.

■ Although they did not object to the judge's disposition of the ninth request, since it raises a question more substantial than the others, we will consider it. It was that the verdict against Schwarz and Nass could not stand alone upon their cashing of the $1,000 cheque. We have already shown that the jury might have treated the transactions of April 19, including the later delivery of the cheque, as merely colorable. If they were so, when Schwarz and Nass cashed the cheque they did more than prefer themselves as creditors; they withdrew assets which had always remained theirs, just as when they stole from the till, and delivered goods to the hotels. It is true that if they had remained co-owners with Olweiss, Olweiss's trustee would have been entitled to only one-third of the assets; and so far as Schwarz' and Nass's depredations did not extend beyond two-thirds of the assets, they might argue that, even though they were robbing their creditors, they were not robbing Olweiss's trustee. A charge to that effect would have been of no conceivable value to them; nor would this view of the facts have resulted in a dismissal of the indictment against them. Their aid and abetting of Olweiss was general and included the assets of the business indiscriminately. It is needless to say that no such theory of the case was suggested at the trial; we have developed it only in answer to the question raised by the request. The case is not one in which we are disposed to stretch a point in extenuation of such patent guilt.

■ The only remaining question concerns what took place after the jury had retired at 3:35 P. M. They had twice asked for some exhibits and finally came back at 5:50, when the foreman said that they seemed "to be hopelessly divided." The following colloquy then took place.

"The Court: It is a simple question. You should not have the slightest difficulty in coming to an agreement on this. I am sure you cannot act like a boy and go in a corner and say, 'I have made up my mind and that is the end of it.' You should discuss the facts. If there is any question of law, let me know what it is and I will be glad to help you.

"The Foreman: There does not seem to be a question of law. We differ as to the facts.

"The Court: I live in Flatbush and I can come over in a couple of hours. You may also have all day tomorrow and the next day if you want it."

After some other discussion as to the accountant, which is too trival for consideration, the jury again retired, and at 6:20 re-

turned their verdict. The defendants insist that the remarks quoted were, first, an implied threat to hold the jury together for two days, if they did not agree; and second, an invasion of their freedom by in substance telling them that they must convict. The first point is altogether without merit. The judge said no more than that, if they found it necessary to confer for two days, he would be at their service. They had been out only two hours; and the implication that he meant to keep them together for so long was much too remote to be taken seriously as a threat. Nor is the second objection valid. To say that the case was "simple," and that the jury should not have the "slightest difficulty" in deciding it, was not, at least literally, to say that the judge thought the accused guilty. In fact the issues were not difficult, certainly not unless the jury accepted the defendants' estimate of the amount lost in the flood, for otherwise, as we have said, the accountant's computation stood without answer. However, the jury may have inferred that the judge thought the accused guilty, in spite of his having told them in this colloquial charge that he would express no opinion as to the facts, of which they were to be the judges. Even so, as everyone knows, had he thought justice so required, he might have expressed such an opinion. True, he was bound in doing so to be fair and even-handed; but, so far as what he said was the expression of an opinion, it was a very roundabout way of doing so. A jury which felt itself coerced by such language would have lacked all independence of mind; would have been no better than a sounding board for any judicial whisper. The Ninth Circuit in 1923 did reverse a conviction for remarks substantially the same as those in the case at bar (Quong Duck v. United States, 293 F. 563); but they were coupled with an inquiry as to how the jury were divided, and that contributed to the result, certainly in the minds of two of the judges. It alone should have been enough for reversal. Brasfield v. United States, 272 U.S. 448, 47 S.Ct. 135, 71 L.Ed. 345. Quong Duck v. United States, supra, has never been cited upon the point; and the Supreme Court in Simmons v. United States, 142 U.S. 148, 155, 12 S.Ct. 171, 35 L.Ed. 968, treated even stronger expressions of opinion as within the judge's power of comment. Although that was more than fifty years ago, and the recent temper of the court may in the meantime have somewhat changed as to the functions of a judge, the decision still stands as the last ruling on the question. Our decision in Wissel v. United States, 2 Cir., 22 F.2d 468, was totally different; the judge in effect told the jury that if they did not convict, they would be false to their oaths.

Convictions affirmed.