### SHOCKLEY et al. v. UNITED STATES.
### No. 11511.

Circuit Court of Appeals, Ninth Circuit.
March 10, 1948.
Rehearing Denied April 7, 1948.

William A. Sullivan and James E. Burns, both of San Francisco, Cal., for appellant Shockley.

Ernest Spagnoli and Aaron Vinkler, both of San Francisco, Cal., for appellant Thompson.

Van H. Pinney and Melvin M. Belli, both of San Francisco, Cal., amicus curiae on behalf of appellant Thompson.

Frank J. Hennessy, U. S. Atty., and Daniel C. Deasy, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before GARRECHT, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

Appellants were, at all times herein mentioned, prisoners lawfully confined in the United States Penitentiary at Alcatraz Island, California. (See footnote 5.) They appeal from a conviction before a jury upon an indictment charging them in one count with the crime of first degree murder. Omitting formalities, the indictment reads as follows:

"(18 U.S.C.A. Sec. 253; 18 U.S.C.A. Sec. 452; Murder of Employee of United States Penal Institution.)

The Grand Jury charges:

On or about the 2nd day of May, 1946, at the United States Penitentiary, at Alcatraz Island, California, a place reserved for the exclusive use of the United States and under the exclusive jurisdiction thereof and within the said Division and District,

Sam Richard Shockley,

Miran Edgar Thompson and

Clarence Victor Carnes

did unlawfully, willfully, deliberately, maliciously, with premeditation and with malice aforethought and by means of shooting, kill and murder a human being, to-wit, one William A. Miller, who then and there was, as said defendants and each of them well knew, an employee of a United States Penal Institution, to-wit, a duly appointed, qualified and acting Custodial Officer and employee of the United States Penitentiary at Alcatraz Island, California, in said Division and District aforesaid, and engaged in the performance of his official duties as such Custodial Officer, which said shooting as aforesaid did cause the said William A. Miller to die on May 3, 1946."

As the indictment indicates, one Carnes (another prison inmate) was also named therein as a defendant. He was convicted and (by direction of the jury) sentenced to life imprisonment. He did not appeal. The court imposed death sentence upon appellants Shockley and Thompson who prosecuted separate appeals. These appeals were presented together in this court and are here considered together.

The indictment followed an attempt of appellants and other convicts to break out of Alcatraz prison, during which escape attempt one of the prisoners shot and killed a prison guard. Briefly stated, the facts are as follows:

On the afternoon of Thursday, May 2, 1946 several convicts confined in the main cell building of the United States Penitentiary on Alcatraz Island, California, engaged in an organized effort to escape therefrom as the result of a scheme or

plan previously conceived by them. In furtherance of this conspiracy, and as its first step, one of these convicts overpowered a prison guard in this cell building and seized his rifle and a .45 caliber automatic pistol. Prison guards found in the cell building at that time were seized by the conspirators and herded into a cell or cells opened by keys taken from these prison officers, one of them being William A. Miller, who was later shot to death by inmate Cretzer, a member of the group attempting to escape.[1] Appellants were released from their cells by, and then joined, the conspirators in their effort to escape. It was the theory of the prosecution that they continued to be active members of the conspiracy until after the fatal shooting of guard Miller. Guard Miller succeeded in passing to guard Burdett (who hid it) a certain key which would have opened the door leading from the main cell building into the recreation yard of the prison, thereby closing this only avenue of escape. The inmates seeking to escape could not locate this key and the result was to confine the ensuing violence to the main cell building.

### Preliminary Motions

Appellants moved to dismiss the indictment on the grounds that it was returned (only) upon illegal and incomplete evidence submitted to the Grand Jury; that no evidence was submitted to that body establishing the commission of the offense charged, or any lesser offense included therein; that the indictment is duplicitous in that it charges in one count two distinct and separate offenses, i. e., one under Title 18, Section 253, U.S.C.A., and one under Title 18, Sections 451 and 452.

The prosecution resisted the motion and the court denied it. The record convinces us that the ruling of the court was correct. The indictment charges appellants with a single offense, the crime of murder.

■ Both appellants, by motion, supported by affidavits of their counsel, sought separate trials on the ground that each would be prejudiced if required to be tried jointly with his codefendant, thus depriving him of a fair and impartial trial upon the indictment. The court denied these motions. See Rules 8(b) and 14 of the Rules of Criminal Procedure, 18 U.S.C.A. following section 688. The granting or denial of a severance or separate trial to defendants jointly indicted rests in the sound discretion of the trial court. The record convinces us that the trial court did not abuse its discretion. See Latses v. United States, 10 Cir., 45 F.2d 949; Cochran v. United States, 8 Cir., 41 F.2d 193; Raarup v. United States, 5 Cir., 23 F.2d 547, cert. den.

■ Motions by appellants for a change of venue on the ground of local prejudice which made a fair trial impossible, were denied. See Rule 21, Rules of Criminal Procedure. An application of this character is addressed to the sound discretion of the trial court. United States v. Parker, 3 Cir., 103 F.2d 857, cert. den.; United States v. Beadon, 2 Cir., 49 F.2d 164, cert. den.; Younge v. United States, 4 Cir., 242 F. 788, cert den.; Stroud v. United States, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103. Venue is fixed by law. A proper showing and strict conformity with the statute are essential to a proper exercise of the power of the court to transfer the proceedings to another district or division. Hale v. United States, 8 Cir., 25 F.2d 430. Title 28, Section 101, U.S.C.A. provides: "The trial of offenses punishable with death shall be had in the county where the offense was committed, where that can be done without great inconvenience." An attack was made by appellants on local newspaper and radio publicity given the Alcatraz prison break, but, as pointed out in People v. Brindell, 194 App.Div. 776, 185 N.Y.S. 533, 536, "If newspaper articles furnished ground for removal, no defendant could ever be tried in this county for a spectacular crime." Newspapers and radio carried to the entire country frequent and

---

[1] During this escape effort two guards and three inmates were killed and thirteen guards and one inmate were wounded, these casualties resulting from gun fire. Both guards were killed by Cretzer, who was later killed by prison guards in their attempt to suppress the prison break. Appellants, along with inmate Carnes, were indicted and tried for the murder of guard William A. Miller.

detailed descriptions of the progress and results of the "Alcatraz affair," and it does no violence to logic or reason to assume that the effect on readers and radio listeners in other sections would not be perceptibly diminished by the one element of distance from San Francisco. For cases having direct bearing on this issue, see State of Louisiana, v. Rini, 153 La. 57, 95 So. 400; Error dis. 263 U.S. 689, 44 S.Ct. 230, 68 L.Ed. 508; 22 C.J.S., Criminal Law, § 122. We find no error in the ruling on the motion for change of venue.

It will materially contribute to an understanding of the legal and factual issues in this case to summarize in a general way the contentions of counsel in their opening statements to the jury. In substance the theory of the prosecution was that while prison inmate Cretzer fired the actual shot which killed guard Miller appellants aided and abetted and encouraged the shooting of Miller, and in law are responsible as principals; they and each of them participated actively in the criminal conspiracy to escape from Alcatraz Federal Penitentiary which made them responsible not only for their own acts, but for the acts of all their co-conspirators done as a natural and probable consequence in the attainment of the objectives of that conspiracy; everything occurring in the course of (such) a criminal conspiracy is part of the res gestae, and admissible in evidence.[2]

By his counsel, appellant Shockley presented his position as follows: " * * * under the law of conspiracy everybody is jointly responsible for everything that happens in furtherance of a common plan or scheme. * * * It is also the law of conspiracy, however, that *if one member of the conspiracy* or plan that is agreed to among the several conspirators *does something which is different from the original plan,* which was to escape, if one does something different *which was not contemplated, not agreed* [upon] *by any of these men, he alone is responsible,* and the other conspirators are out of the picture.

"Assuming * * * that there was a general plan or scheme * * * Then all the prisoners * * * who made a break for freedom when the guards were overpowered * * * would under the law of conspiracy be liable for everything that happened at a time they were trying to escape. *But if* the facts show that at a certain time it was realized that the plan had failed, and that Krytzer, the ringleader of the whole thing, told them to go back to their cells, and *these defendants did* [then] *abandon that plan of escape and went back to their cells, what happened thereafter is something for which * * * none of these defendants could be responsible * * *.*

" * * * Krytzer was in a frenzy, he could not find the key, the only way to freedom was to go through door 107 * * * but they could not get through that door * * * Mr. Weinhold, the captain of the guards, attempted to reason with Krytzer. * * * just at that moment the siren went off * * * then Krytzer said to them [the freed inmates], 'You can go back to your cells, I am going to stay here.'

" * * * *at that moment * * * these defendants * * * returned to their cells.* * * * there was so much confusion that you can't believe any of the witnesses, the guards, as to what happened after that. Krytzer, in a spirit of frenzy, realizing that all hope was gone, went up to the cells where the guards were [confined] and started shooting into those cells * * * only one of them died, and that was Mr. Miller.

" * * * *This plan of escape had* [then] *been totally abandoned* [so far as defendants are concerned] * * * if Mr. Miller * * * had the key * * * and he refused to give it up, and Krytzer or Hubbard or Coy, or anybody else, killed him, everybody who stepped out of their cells and tried to escape would be responsible criminally, and would be on trial for murder because that would be a natural and probable cause [consequence?] of the general plan of escape. In this particular case the plan of escape had been abandoned. * * * what happened thereafter was an in-

---

[2] In the trial the death of guard Stites (who was shot to death) was shown as part of the res gestae.

dependent, fresh project emanating from the mind of * * * Krytzer.

"* * * It will be their [the various inmates called to testify] word against the word of the guards. * * * they [defendants] are not on trial for escape. * * * They are on trial for the death of William A. Miller, who was killed by Joseph Paul Krytzer, a bank robber, police killer, a marshal killer * * *." (Emphasis supplied.)

The essence of the statement to the jury by counsel for appellant Thompson was as follows: "* * * Thompson * * * did not agree at any time, nor did he at any time arrange or conspire with anyone to kill Guard Miller, nor did he arrange or agree with anyone else to make an escape from Alcatraz. He is not charged here with an escape. * * * On May 2 of 1946 * * * Alcatraz * * * had a commotion * * * one of the convicts * * * unlocked C block, and * * * Thompson along with some other prisoners got out * * * Thompson went back to his cell immediately after the siren blew and stayed in his cell until Saturday forenoon. * * * any shooting * * * took place after the siren blew and long after Thompson was in his cell. * * * Coy planned this whole break. Coy conspired with Krytzer and Hubbard to make this break. Whatever happened after these men made this break was not the result of any * * * arrangement with the defendant Thompson. * * * The government's testimony will be supplied, naturally, by guards. * * * It is practically an issue of convicts against guards. Who is going to tell the truth? That is up to you." (In the record the name of inmate Cretzer is frequently spelled "Krytzer".)

On these introductory statements, the case proceeded to trial.

### Comments of the Court

■ The trial in the district court required a month and was marked by several exchanges between court and defense counsel, generally in connection with the admission or rejection of testimony. Appellants assail remarks of the court upon these occasions asserting that they were severe in their criticism of the trial tactics of defense counsel and that the total effect of the remarks was to prejudice the rights of appellants because of their influence on the jury. This contention was the subject of a brief by amicus curiae.[3]

Appellants argue that "crimes of the utmost abandonment—murder and prison break—were bluntly given the jury directly, while indirectly, every unfortunate incident in the past lives of the defendants, whether amounting to a crime or not, was brutally insinuated to the triers of the facts. * * * Young and inexperienced counsel (and even incompetent counsel, if we believe what the court actually told the jury) were appointed for the defendants. * * * Certainly we may not, nor do we, demand a reversal upon the basis that the character per se of the crime charged inflamed the jury or because of the comparative ability and experience of the several counsel * * *. A reading of the entire transcript indicates that his [the trial judge] attitude, his demeanor and his activity and expressions in the conduct of this cause are little less than shocking to a sense of justice."

The presiding judge in this case was an able and experienced jurist. His duty was to guide the course of a long and difficult trial during which he had to make immediate rulings on a large number of warmly contested issues. Some of the questions of defense counsel were regarded by him as time-consuming and wholly immaterial. The record clearly reveals that energetic and aggressive (and we think capable) defense attorneys did not yield gracefully to a great many of his rulings. Upon these occasions they couched their protests in exceedingly pungent, vigorous and even profane speech; the replies of the judge, in attempting to answer these protests, form the basis of appellants' contention that they prejudiced the defense in the minds of jurors.

We have carefully examined the trial record and as a result we do not believe that these comments between court and defense counsel so misled and prejudiced jurors that

---

[3] Arguments of amicus curiae are considered as made by appellants.

they became partisans of the prosecution. We cannot abandon our faith in the capacity and desire of a Federal jury to avoid being mired in irrelevancies, and the record does not reveal that the jurors in the case lost or discarded their innate sense of fair play and were inspired to render a verdict not based entirely on the evidence admitted by the court.

This conclusion is fortified and emphasized by the important fact that the court gave specific instructions .to the effect that jurors must wholly disregard court rulings and comments during the trial; that because the court had admonished and reprimanded counsel in connection with the conduct of the trial, the jury should not draw any inferences from remarks or comments or rulings of the court on those occasions that the court was intending to convey to the jury in any manner whatsoever its view or opinion as to what the verdict should be —that (such) comments of the court were only pursuant to the power and duty of the court to supervise the trial and expedite it —that (any) admonitions or reprimands were matters only between the court and the attorneys and that they cannot and must not reflect in any manner upon the guilt or innocence of the defendants.

Jurors were instructed to confine their deliberations to, and exclusively to rely upon, admitted testimony and exhibits, in reaching a verdict. The court, in excess of caution, added the further admonition to the jury that: "It would be a travesty upon justice if any juror were to bring to bear upon the vital question of the guilt or the innocence of the defendants some matter involving the conduct or acts of any attorney in the cause."

■ These unambiguous and eminently fair instructions reach straight down into the very heart of the problem posed by appellants' contentions. If any member (or members) of the jury had felt the slightest uncertainty as to the possible attitude of the judge, these blunt admonitions were sufficient to lay any doubt at rest. (There was also the usual caution about argument of counsel to the jury in connection with which it may be noted that counsel for Thompson complains that it was prejudicial error for

Government counsel to "demand" of the jury that it impose the death penalty rather than merely to "ask" for it. This claim has no merit. That was the penalty demanded in the indictment.)

We think that these instructions effectively represented the conscientious effort of a judge to make plain to jurors that justice, decency and fair play would not and could not prevail in the trial unless they wholly disregarded colloquy between court and counsel over procedural matters. They emphasized to the jury that the judge did not want any court ruling to be regarded as indicating his personal convictions as to the guilt or innocence of either appellant. Certain it is that the court made a sincere effort to insure jury consideration of only relevant matters admitted for their consideration, and to prevent the possibility of an unfair verdict by the jury. Counsel for appellants made no request for mistrial as a result of the matters discussed above. The views we expressed in Meeks v. United States, 9 Cir., 163 F.2d 598, do not militate against this conclusion.

Appellants present numerous other assignments and claims of error, asserting them to present such a showing of errors as to justify and require a reversal. Some of these claims of error pervade every area of the trial. These contentions will be referred to later. At this point we indicate the general nature of the evidence upon which the jury found a verdict of guilty against appellants. The transcript on appeal contains nearly 2200 pages and the evidence must be summarized.

### The Evidence

■ Ample evidence was presented to the jury from which it could properly infer and conclude that the following controlling facts had been established as true beyond a reasonable doubt. Prison officer William A. Miller, for whose murder appellants were tried, was on May 2, 1946, a senior officer or instructor employed by the United Sates at the United States Peniteniary at Alcatraz Island, California. On the afternoon of May 2, 1946, the day he was shot by inmate Cretzer, he was assigned to, and was on official duty on the ground floor of the main cell house of this Federal prison,

this being the building where the attempted prison break was made. This main cell house is 215 feet long and contains three cell blocks of 180 feet in length. At the west end of this main cell house are two elevated gun galleries for guards, the lower one about ten feet above the cell house floor. The upper gallery is ten feet above the other one and both are designed to give guards a commanding view of the interior of the cell house. They are connected by two stairways. An elevated "gun gallery" is located on the east end of the cell house. There are no stairways leading from the floor of the cell house to these gun galleries, and they are supported by posts.

Appellant Thompson had been employed in the tailor shop of the Alcatraz prison for some time prior to May 2, 1946. On Monday, April 28, 1946, he requested the foreman of the tailor shop that he be given a "lay-in" (a lay-off period away from his work in the shop) on the afternoon of Thursday, May 2, 1946. He repeated this request the next day, Tuesday, April 29, 1946, and again on Wednesday, April 30, 1946. He was given permission to lay off on Thursday afternoon although he worked in the tailor shop the morning of that day. About 1 o'clock p. m. of May 2, 1946, Thompson visited the prison doctor and told the doctor that he was "sick all over" and wanted a "lay-in" for that afternoon. (If granted, the inmate could remain in his cell quarters for the period of the granted "lay-in". Thompson specified no particular illness.) The doctor gave him a document permitting this cell "lay-in" on that afternoon. (The jury was directed to consider testimony regarding this lay-in episode as applying only to Thompson.)

At 1:30 p. m. on May 2, 1946, the day of the attempted prison break, Miller and prison guard Lageson were on duty in the cell house. Lageson left at that time. At 2:15 p. m. one Bristow, a prison culinary supervisor entered the cell house and observed an officer's trousers and some keys on the floor. He then saw inmate Coy up on the west gun gallery waving his arm over the side of the gallery. Inmates Carnes and Hubbard were then out of their cells. Coy's duties as magazine orderly explained his absence from his cell but not his presence on the gun gallery. Carnes placed a sharp instrument against Bristow's throat and forced him to one side of a main passage between cell blocks. Bristow saw Coy pass a gun down to Hubbard. Carnes, on orders from Coy, placed Bristow in cell 404 then occupied by two inmates. Miller had been seized and confined to this cell clothed only in his shirt and underwear with his hands tied behind him.

Shortly after Bristow was placed in the cell with Miller, prison officers Burdett, Corwin and Lageson were seized and placed in the same cell. Bristow recognized inmates Coy, Cretzer, Shockley and Carnes outside the cell when these officers were placed in it. At this time Hubbard was moving back and forth in front of the cell with a rifle in his hands; Cretzer was holding a .45 caliber automatic pistol and Carnes held an officer's club. Coy tried to lock the cell door and failing in this, the two other prison inmates of the cell were removed, and the officers then in cell 404 were removed to cell 403. Shortly after, prison officer Weinhold was seized and placed in the same cell with the other imprisoned officers. Inmate Thompson accompanied Cretzer and inmate Shockley when they placed Weinhold in the cell.

About 2:20 p. m. prison officers Simpson and Baker entered the cell house and were seized by inmate appellants, Thompson and Shockley, who were then with inmate Cretzer. Appellant Thompson then held a rifle; Cretzer held an automatic pistol, and appellant Shockley held a wrench or club in his hands. Officer Baker was with officer Simpson and both of these men were then locked in cell 402. Sundstrum, record clerk of the prison, was also seized and put in this cell (No. 402) by Shockley and Cretzer, both armed as just above indicated. Shockley struck Sundstrum and compelled him to remove his trousers; money in possession of Sundstrum was taken by Cretzer.

Burch, a custodial officer of the prison, was assigned to the west gun gallery and was on guard duty on May 2, 1946. He was armed with a .3006 Springfield rifle and a .45 caliber Colt automatic pistol. About 2

p. m. of that day, inmate Coy, who had managed to secure access to the lower gun gallery, assaulted Burch and left him unconscious, taking the rifle and pistol of this guard. The hands of Burch were tied behind him with his neck tie and he was tied to a conduit pipe on the gun gallery with a cord about his neck. His uniform and shoes were taken from him, also his keys. By this operation Coy secured the keys of this guard along with his rifle and fifty rounds of ammunition and the automatic pistol with twenty-one rounds of ammunition.

While officers Miller, Burdett, Corwin, Bristow and Lageson were confined in the second cell, No. 403, appellants Shockley and Thompson, along with inmates Cretzer, Carnes, Hubbard and Coy were outside that cell. Cretzer asked officer Miller for his keys and Miller gave him a ring of keys. These inmates then went to the door leading into the outside courtyard, but key No. 107 which opened that door had previously been given to officer Burdett who had managed to secrete it in Cell, No. 404. The inmates came back to the second cell a number of times, Coy demanding to know what key opened the door to the courtyard. Miller told him 107. The inmates were then all looking for that key.

About this time the prison siren sounded. Cretzer, Carnes, and appellants Thompson and Shockley, were then standing outside the cell where the officer guards were confined; Cretzer was then holding the pistol and Carnes a club. Appellant Shockley carried no weapon. Officer Weinhold then urged Cretzer to tell his boys (inmates) not to go outside—"if they do they will get hurt." Cretzer replied "you mean they will get killed, don't you?" Appellant Shockley said, "We are going to kill all of you; kill all of you s. o. b's. * * * kill everyone of the yellow bellied bastards. We won't have any testimony against us." Then appellant Thompson spoke up and said, "Yes, we want no living witnesses." Cretzer said to Weinhold, "You are going to be the first one to die, the first s. o. b. to die," and then Cretzer shot Weinhold in the chest and shot officers Corwin and Miller; he also fired the pistol at other officers confined in the cell.

Cretzer then went to the other cell in which officers Sundstrum, Baker and Simpson were confined, and fired a number of shots into the cell, wounding Baker and Simpson, whereupon he returned to the other cell and fired at officer Lageson, saying, "There's one s. o. b. that hasn't even been hurt." While not injured, Lageson pretended that he had been struck. Cretzer, Carnes and appellants Thompson and Shockley then walked away toward the west end of the cell house.

The officers in the main cell house were released by the guards late in the night of May 2, 1946. Officer Miller died the following day as a result of the gun shot wound inflicted by Cretzer. Prison officials succeeded in getting armed guards into the west gun gallery through an outside door but a number of guards were wounded by gun fire from Cretzer. Guard Harold Stites was shot and killed by inmate Cretzer while in this gallery. Inmates Cretzer, Coy and Hubbard took refuge in one of the cell house corridors where, in the suppression of the attempt to escape, they were later killed by prison guards.

The record convinces us that the evidence introduced to prove the facts outlined above, was properly admitted, and that it fully supports the verdict. This evidence established beyond a reasonable doubt that a single conspiracy, purpose or agreement (which included Cretzer among its first members) existed among a number of inmates of the Federal penitentiary on Alcatraz Island having as its common design an attempt to escape by the use of violent means from the institution on the afternoon of May 2, 1946; that pursuant to this conspiracy these convicts did attempt so to escape in the manner disclosed by the evidence outlined above; that as part and parcel of that plan and conspiracy, appellants Shockley and Thompson were promptly released from their cells by these conspirators and immediately joined them and adopted, and became active and aggressive members of, their conspiracy to escape; that appellants did not abandon their participation in this conspiracy prior to the shooting of guard Miller, but were, at the time of his shooting, actively engaged in execution of

the common purpose and design of the conspiracy.[4]

The evidence was also sufficient to establish that both Thompson and Shockley did actively aid and abet inmate Cretzer in his act of shooting guard Miller in that they did urge and counsel Cretzer to commit this offense.

While appellants were not charged in the indictment with the offense of attempting to escape from a Federal prison,[5] the murder with which they were charged was committed during the time that the conspirators were actively engaged in the commission of this felony. To establish the truth of the charge against appellants, it was not necessary to charge them in the instant indictment with a conspiracy to escape, followed by an attempt to escape; it was proper to show by the evidence that such a plan or plot existed, and when the evidence revealed its existence and what was done pursuant to it, the act of one or more participants in furtherance of the common plan, is in law, the act of all. See Davis v. United States, 12 F.2d 253, cert.den. Cf. United States v. Olweiss, 2 Cir., 138 F.2d 798, 800. (See footnote 6.)

The act of Cretzer in shooting Miller was part of a plot and plan to seize the guns and ammunition of a guard or guards as a first step, then overpower the guards in the cell building and secure their keys which might provide access to an open prison courtyard and to the cells in the cell building, and then to use such force as was necessary to insure the escape of the conspirators from the penitentiary. The fact that the conspirators first armed themselves with a rifle and pistol, and with other weapons including clubs and wrenches, undoubtedly persuaded the jury that they fully intended to use these lethal weapons to effect their escape.

In the law of conspiracy the overt act of Cretzer in shooting Miller while the escape effort was under way, is attributable to appellants. See Pinkerton v. United States, 328 U.S. 640, 647, 66 S.Ct. 1180.[6]

We find no merit in the contention that appellants were improperly charged with, and convicted of, the crime of first degree murder. The crime charged in the indictment was laid under 18 U.S.C.A. § 253 and 18 U.S.C.A. § 452. Omitting unnecessary language Section 253 provides that: "Whoever shall kill, as defined in sections 452 and 453 of this title, any * * * employee of any United States penal * * * * institution, * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under section 454 of this title."

Section 452 above referred to provides (omitting unnecessary language) that: "Murder is the unlawful killing of a human being with malice aforethought. * * * Any other murder is murder in the second degree."

Section 454, above referred to, provides: "Every person guilty of murder in the first degree shall suffer death."

---

[4] The facts in this case do not bring it within the rule announced in United States v. Peoni, 2 Cir., 100 F.2d 401, 403.

[5] The act of the conspirators in this case in seizing the guns of a guard and thereafter attempting to force their way out of and escape from the institution by acts of physical violence against prison guards, was, in itself, a crime against the laws of the United States amounting to a felony, Title 18, Section 753h, since all members of the conspiracy, including appellants were, at the time of the attempted prison break, lawfully confined in Alcatraz prison serving sentences of imprisonment resulting from convictions of crimes constituting felonies, and were inmates of this Federal prison under proper commitments. Cf. Giles v. United States, 9 Cir., 157 F.2d 588.

[6] It was not even necessary for appellants to have been at the actual front of the cell with Cretzer at the exact time he shot Miller in order for them to be legally liable as principals in the crime of his murder. See Collins v. United States, 8 Cir., 20 F.2d 574, 578; Parisi v. United States, 2 Cir., 279 F. 253, 255; Borgia v. United States, 9 Cir., 78 F.2d 550, 555, cert. den. See also Greenberg v. United States, 297 F. 45. Where in such an unlawful attempt to escape, an innocent person is killed, and the killing is a probable and natural consequence of the attempt, the killing constitutes the crime of murder. Boyd v. United States, 142 U.S. 450, 455, 456, 12 S.Ct. 292, 35 L. Ed. 1077.

 There is no merit in the contention that since Cretzer shot guard Miller *in the heat of passion,* and thereby committed only the offense of manslaughter, it was improper to charge appellants with a greater offense—that of murder; See Title 18 U.S.C.A. §§ 453, 454, that in no event could they be found guilty of an offense which Cretzer did not commit; that even though it be proven that they "aided and abetted" Cretzer, they were thereby aiding and abetting (only) the offense of manslaughter, not murder; that it was error for the court to refuse to so instruct the jury.

We think that the evidence sufficiently establishes that Cretzer unlawfully killed guard Miller, wilfully, deliberately, maliciously, with premeditation and with malice aforethought. The issue of the presence or absence of *malice aforethought* as an essential ingredient of the offense of murder, was the subject of a correct instruction. Our view of the element of malice under a charge of murder in the first degree, was presented in Paddy v. United States, 9 Cir., 143 F.2d 847, 852, where this court said:

"The appeal also raises the question whether the district court erred in failing to instruct the jury that there was no evidence to show the deliberation and premeditated malice for and purposefulness necessary for conviction, and that the jury was required to bring in a verdict of a lesser offense. Our summary of the evidence shows that the motion was properly denied. For the same reason we find no error in the following instruction to the jury:

" 'By "deliberate and premeditated" as used in the indictment is meant that the idea of killing must have been conceived and intended before the act which produced death; namely the shooting. * * * The deliberate purpose to kill, and the act in execution thereof, may follow each other as rapidly as successive impulses or thoughts of the mind; it is enough that the purpose and intent to kill precede the act. * * * ' "

 Title 18 U.S.C.A. § 550 provides as follows: "Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

It will be noted that the language of this section relating to aiding, abetting, etc. is expressed in an alternative or disjunctive manner. Appellants contend that the evidence must show that they did aid *and* abet—that is to say, show some joint act of aiding *and* abetting—aiding alone or abetting alone would not be a sufficient showing to bring them within the orbit of the statute.

This view is advanced in support of their argument in this court that the remarks of appellants at the time of the shooting of Miller and other imprisoned guards by Cretzer were not an *act* of aiding or abetting (under this statute) but merely an "expression" which was not a command or inducement to Cretzer to kill Miller; that it did not express any murderous *intent* of appellants any more than yells from a crowd at a ball game such as, "kill the umpire" would express such intent and justify charging all in the audience with conspiracy to murder in case some fellow in the crowd threw a pop bottle at the umpire and killed him.

 The court quoted the exact language of the statute on aiding and abetting, then followed this quotation by a general statement, as follows: " * * * that where a person does aid *and* abet or counsels or commands or induces or procures the commission of a crime such as murder, is liable, responsible criminally, and subject to punishment in the same manner as the one who actually committed the precise act of murder. It is not necessary that one who aids and abets the commission of a crime shall be present when the crime is committed in order to sustain his conviction as a principal. Likewise his mere presence at the time and place of the commission of the crime is not sufficient to find one guilty as a principal unless, coupled with the presence of that person, there is a causal connection with some act by way of aid, counsel, command, inducement or procurement." (Emphasis supplied.)

This paraphrastic treatment of the statute was favorable to appellants. Their contentions regarding this aspect of the case are without merit. Whatever the impulses stirring Cretzer when he shot Miller, the

evidence sufficiently shows that appellants were then urging Cretzer to murder Miller and the other officer "witnesses." The speech of appellants at the time Cretzer shot Miller counseled murder—it was an inducement to commit the crime of murdering guard Miller and not a meaningless and harmless "expression." Cf. Borgia v. United States, 9 Cir., 78 F.2d 550, 555; United States v. Olweiss, supra.

We find it unnecessary to pass upon several of contentions made by appellants as we think they lack merit. Others are here considered. On behalf of appellant Thompson it is urged that testimony showing guard Stites had been killed during the shooting that took place in the escape attempt, was highly improper despite the fact that it was offered and admitted on the theory that the occurrence was part of the res gestae; that it was improper, and unfair, by the cross-examination by the district attorney to show that Thompson had been convicted of many felonies, including murder—showing (only) one would have been enough for the purpose of impeachment; that the judge did not give him a chance to defend himself by personally addressing the court during the trial or to say anything when he was sentenced (he was accompanied at the time of sentence by his two trial counsel, and the record shows no statement by counsel, or request from them or Thompson to make any sort of statement); that the indictment makes no mention of *a conspiracy to kill* and therefore did not advise him of nature and cause of the charge, thus permitting a later indictment *for conspiracy to commit murder* against which he could not successfully plead double jeopardy;[7] misconduct on the part of the district attorney in asking one Baker, a prison inmate and defense witness (who testified that Thompson was in his own cell when the shots that presumptively killed Miller were fired) if he had been convicted of any other felony than the one he admitted in direct examination; that the question was objectionable since it was an attempt to "humiliate and degrade" the witness rather than to impeach him and affect his credibility; that in response to this particular question the witness stated that he had been convicted of another crime, that of murder and when asked whom he murdered he stated that he had killed his father; that the court refused to strike the answer. (No objection was made when Baker was asked to state the identity of the person he murdered.) These contentions are without merit.

On behalf of Shockley it is urged that evidence fails to show that he had prior knowledge of the "break"; that we might assume that he joined a conspiracy to effect an escape but this was not a conspiracy to kill; that there must be an *object* of a conspiracy, a *common design;* that in this case his *design* and *intent* were to escape from Alcatraz—not to kill Miller; that a criminal *act* and a criminal *intent* must join, and this union of act and intent are not shown by the evidence; that we cannot *infer* the act (of murder) from the existence of his intent to escape.

We think that the evidence and the verdict of the jury thereon fully answer these contentions. They have no merit.

Shockley interposed the defense of insanity, and now claims that the prosecution did not sustain the burden of proving him sane by substantial or any evidence.[8]

The evidence does not sustain Shockley's contention with respect to his plea of insanity. The court submitted this question to the jury under proper instructions, and the jury, by its verdict, found him to be sane at time of the shooting of guard Miller.

---

7 The comments of the court in United States v. Sall, 3 Cir., 116 F.2d 745, 748, on the matter of double jeopardy are not applicable to instant case.

8 Prior to the trial and on petition of his counsel, the court ordered a qualified physician to examine Shockley and report his findings to the court in advance of trial. This physician reported that at the time of his examination, Shockley was able to understand the nature and consequence of his actions, was capable of understanding the nature of the charges against him, was able to confer with his attorney, and was capable of preparing his defense. The physician expressed no opinion in this report (or in his subsequent testimony at the trial) as to the sanity of Shockley on May 2, 1946.

Appellants contend that the court became "an advocate for the prosecution" by reason of an emphasized (by them) phrase in the instructions, as follows: " * * * Many men and women over many decades have sincerely and honestly labored and given thought to the great problem of what shall be done *with those who infract the law.* That, however, is a matter, as I say, for those who are entitled to properly and without ulterior motives give consideration to those matters. We all hope that some day the human race will so improve that we may find some more adequate solution to such grave problems. * * * "

This statement was made because of a comment by counsel that some juror in another case had commented on the conduct of Alcatraz prison. Before employing the language quoted above, the court had told the jury that it was beyond the function of the juror in the other case to make such a comment; that the duty of this jury was to determine the guilt or innocence of the defendants and not matters connected with "the conduct of Alcatraz." It added: "But we here in this court are bound by rules and principles, and it is our duty in the interests of justice to make our decisions within the boundaries of such rules and regulations."

The instruction was not error.

Appellants assail the giving of certain instructions or portions of instructions, but an examination of the record discloses that they did not conform to Rule 30 of the Rules of Criminal Procedure by objecting to these instructions before the jury retired and therefore they will not be considered here.

Before the jury retired objection was made by Thompson to the following instruction: "You may also consider in that connection the criminal record of any defendant. You may not disregard the testimony of a witness because he is a convicted felon, but you may consider in determining whether you wish to believe all or any part of his testimony his criminal record."

The use of the term "criminal record" by the court was not prejudicial or harmful for the reason that the "criminal record" in the evidence complained of consisted of convictions of felonies by Thompson. There was no other criminal record for the jury to consider. The Government was not limited to showing only one conviction of a felony by a defendant. It was permissible to show that a defendant had been convicted of other felonies, such evidence having a bearing upon his credibility. MacKnight v. United States, 1 Cir., 263 Fed. 832, 840; Edwards v. United States, 10 Cir., 18 F.2d 402.

When the jury returned its verdicts into court, it was polled by direction of the court and each member of the jury, in answer to a call by the clerk, stated that the verdict in the case of United States v. Sam Richard Shockley and in the case of United States v. Miran Edgar Thompson was his or her verdict, the verdict in each of these cases being that each of the said defendants was guilty of murder in the first degree. Thompson claims that the verdict was not complete. The court conformed to the requirements of Rule 31(d) of the Rules of Criminal Procedure, and the claim of error is without merit.

When a motion for a new trial was made by appellants, the attention of the court was directed to the fact that while the jury was deliberating on their verdict, on the night before returning it into court, one juror was separated from the jury. Commenting on this matter, the court stated: "Well, I know what you refer to. Well, that was done with the consent and at the direction of the court. Juror Elinsky was a man who lost both legs in World War I. He was unable to walk on foot to the Whitcomb Hotel, one block away, and the court directed an officer of the court to take him there in an automobile so he could go to the hotel and go to sleep last night. That incident occurred with the full knowledge and permission and at the direction of the court. In the opinion of the court, it is not a separation of the jury. The court having personal knowledge of the incident finds that there is no merit in such point as a defense."

The statement of the court and the complete absence in the record of anything serving to even suggest that this temporary

and apparently necessary separation in any wise affected the verdict of the jury, persuades us to the view that even if the granting of permission by the court for this brief separation could be construed as error, it was a harmless error that resulted in no demonstrable prejudice to appellants.

Motions for a new trial and arrest of judgment were made by both appellants, this after reception of the verdict and direction to the clerk to enter the same. They were rested primarily on the claimed insufficiency of the evidence to support the verdict and improper admission of testimony. The court made plain to counsel that these motions reached the identical objections presented at the time the court had ruled on offered testimony during the trial, and thereupon denied the motions. We perceive no error in this ruling.

We think that the evidence upon which the jury rested its verdict was properly admitted and was more than ample to support the verdict. As a whole, the instructions fully and fairly stated the applicable law in language free from doubtful meanings. From the whole record we are convinced that appellants had a fair trial and that judgment and sentence, as to both appellants, should be affirmed.

Affirmed.