**UNITED STATES of America**

v.

**Francis P. LONG and John Hackett.**

**Crim. A. No. 75–82.**

United States District Court,
W. D. Pennsylvania.

Nov. 2, 1976.

James E. Roark, Asst. U. S. Atty., Pittsburgh, Pa., for plaintiff.

Robert Cindrich, Pittsburgh, Pa., for defendant Long.

Irwin D. Wedner, Pittsburgh, Pa., for defendant Hackett.

## OPINION

SNYDER, District Judge.

The Defendants were charged in a six count indictment with violations of Title 18 of the United States Code, Section 371 (conspiracy), Section 1502 (obstruction of justice), and Section 1623 (making a false material declaration to a grand jury, and/or perjury). After conviction by a jury, Defendants now contend the evidence was insufficient to support such convictions and that errors were committed by the Trial Judge requiring a new trial. The Motions will be denied.

The investigation began when Norman Irvin, a Councilman for the Borough of North Braddock, related to Special Agent Edward L. Stewart of the Federal Bureau of Investigation that payoffs were being made to members of the North Braddock Borough Council by Long Hauling Company, a garbage removal company which had a contract with the Borough. Investigation focused on whether there were violations of the Hobbs Act as an extortion (18 U.S.C. § 1951) or of the Organized Crime Control Act of 1970 as bribery (18 U.S.C. § 1961, *et seq.*). Stewart interviewed the nine Councilmen and several other officials of the Borough during the summer of 1974 without success. On October 9, 1974, Stewart also interviewed Francis P. Long, the principal owner and operator of Long Hauling Company, who denied any kickbacks, payoffs, or bribes involving the garbage contract.

On October 15, 1974, Irvin informed Stewart that he and Councilman John Hackett had gone that day to see Francis P. Long and that a payoff was to be made the following day. On October 16th, Stewart provided Irvin with a body tape recorder and procured a search warrant for Irvin's vehicle. Stewart also supervised a physical surveillance of the Long Hauling Company premises. Photographs taken that date revealed the presence of Hackett at the Long Hauling Company with Irvin. After Hackett and Irvin left the Long Hauling Company premises, Stewart and other Agents stopped the vehicle, executed the search warrant and seized nine envelopes each containing $240 in United States currency.

On several occasions after the seizure, Stewart attempted to reinterview Long and Hackett, and finally subpoenaed them for appearance before the Federal Grand Jury in Pittsburgh on November 1, 1974. He again provided Irvin with the body tape recorder to record conversations between Irvin and the Defendants prior to and after their grand jury appearances.

In interviews with Stewart, Irvin further related that as early as January of 1974, Hackett had explained to him that each Council Member got $50 a month for the garbage contract, and that he, Hackett, had previously received $100 a month on the garbage contract, but this amount had been reduced because of the lower value of the new contract. Irvin further claimed he had received $250 between March and May of 1974 from two North Braddock Council Members.

According to Irvin, on October 14, 1974, Hackett asked Irvin to drive him to Long Hauling Company in Duquesne to pick up money from Long which was to be distributed to the Council Members. On October 15, 1974, he and Hackett went to the premises of the Long Hauling Company and discussed the payment of the money with Defendant Long and after this first meeting they were to return the next day to collect the money from Long. The tape recordings reflect that upon the arrival of Irvin and Hackett at Long Hauling Company on October 16, 1974, Long stated "just open up the envelope. There is $200 and two twenties, just check it there". Later, Long said "that straightens you up to October, see and then every two months you know . . . that's only 120 dollars" (the jury could well infer from this that the $240 in the envelopes were payments to date). Tape recordings of conversations later that day further indicated that after the money had been seized, Hackett stated he would call Red Long to see if Red Long would go along with the story of the raffle

tickets, and that Irvin and Hackett agreed to see Long the next day about it.

Irvin testified that when he and Hackett went to Long Hauling Company on the following day and explained that the FBI Agents had seized the nine envelopes, Long said "We are sunk. We are beat. We are finished." Hackett then explained to Long that the Democratic organization of the Borough of North Braddock was holding a raffle to raise money for the November elections and that there were tickets available which would cover the $240 in each envelope. Irvin testified that Long asked if they thought it would work and further stated that he, Long, would have to check with his attorney to see "if it was legal and if it would work". Irvin testified that at that time he took two thousand raffle tickets [1] from his truck and gave them to Long stating that the additional one hundred and sixty tickets would be delivered the following day. True to his word, on October 18, Hackett delivered the one hundred and sixty raffle tickets [2] to Irvin's place of business and Irvin took them to Long. Irvin testified that Long again asked if he (Irvin) thought the raffle ticket story would work and Long stated "that if we all stick together and stick to the story, it will work."

The tapes and Irvin's testimony showed that on November 1, 1974, he and Hackett drove to Pittsburgh to appear and testify before the Federal Grand Jury. The conversation, as recorded, indicated that Hackett, in discussing the October 16 seizure, said "I just thought real quick, you know, I said that's for raffle tickets, Stewart. . . ." The tape of that conversation also revealed that Hackett said the Federal Bureau of Investigation could not break the $240 in each envelope into monthly payments because "we wasn't getting $60 a month, we were only getting $50 . . . 'cause Drabik was cutting himself in." (In his testimony, Irvin explained the

discrepancy. Drabik, a former Councilman, was cutting himself in on the payments, unknown to Long. So Long was paying $60 a month for each Councilman, but they were only getting $50.)

Defendant Hackett presented no evidence at the trial and Defendant Long presented character witnesses as to his good reputation in the community for truthfulness and being a law abiding citizen.

## I. VERDICT WAS SUPPORTED BY SUBSTANTIAL EVIDENCE AND NOT CONTRARY TO THE WEIGHT OF EVIDENCE

Defendants contend that the verdict rendered is contrary to the weight of the evidence and not supported by substantial evidence. The tests for legal sufficiency of evidence is whether the Government produced substantial evidence, taking the view most favorable to the Government. *United States v. Armocida,* 515 F.2d 29 (3d Cir. 1975); *United States v. Pratt,* 429 F.2d 690 (3d Cir. 1970). Our review of the evidence above indicates that there was sufficient evidence to support the jury verdict of guilty. In part, the jury had before it the physical evidence of the payoffs in the form of the nine envelopes each containing the $240, the surprise expressed by Hackett upon being caught with the money in the nine envelopes, the attempts to invent the raffle ticket explanation, including even consultation with their attorneys on the matter and the failure to explain the odd number of 2160 tickets, delivered after payment was made and in two different trips. All of this evidence formed a sufficient factual backdrop from which the jury could well find the guilt of both Defendants on each charge. The foregoing discussion also applies so this Court cannot say the jury verdict was contrary to the weight of the evidence.

---

1. Hackett got these tickets from the Street Commissioner (Roman) who was holding them until a dispute among the Councilmen was resolved. On the way to the grand jury on November 1st, the tapes recorded Hackett as say-

ing to Irvin "We're fortunate Roman had those 2,000 tickets."

2. These 160 tickets came from Hackett's own supply of tickets to sell.

## II. THE ALLEGED ERRORS OF THE COURT

Defendants contend that this Court erred in admitting into evidence Government's Exhibits 1, 2 and 3, and Government Exhibits 1(a), 2(a) and 3(a). These exhibits were envelopes, the former having typewritten versions of Irvin's handwritten notations which appeared on the latter. The notation on the envelopes read as follows:

Exhibit 1A (Handwritten)

| | | | |
|---|---|---|---|
| Jan. Long Hauling<br>Received $50.00<br>from Jordan Scarpino | Monday<br>3–18–74 | 10 PM | |
| | | 10 P.M. Pickup Truck | |
| LONG | | | |

Exhibit 2A (Handwritten)

|  |  |
|---|---|
| | Garage |
| Long Hauling<br>Thursday   May 30th 1974<br>Received $100.00 from Don Pruchnitzsky | $11^{10}$ AM |
| April & May | |

Exhibit 3A (Handwritten)

| Long Hauling | Feb. & March | $100.00 | Garage<br>3.30 PM |
|---|---|---|---|
| Received from<br>    Don Pruchnitzsky<br>Monday   4–1–74 | | | |

Exhibit 1 (Typed with handwritten notations)

Long Hauling                Pickup Truck
Monday March 18, 1974     10 P.M.
Received $50.00 from Jordon Scarpino
Jan.             (559 Seddon Ave
    Handwritten (Pgh, Pa.    JMM
    Notations   (271–1717   7/15/74
              (         183–14

Exhibit 2 (Typed with handwritten notations)

Long Hauling                Garage
Monday April 1 1974      3:30 P.M.
Received $100.00 from Don Pruchnitzky
Feb. & March              ( JMM
         Handwritten   ( 7/15/74
         Notation     ( 183–14

Exhibit 3 (Typed with handwritten notations)

Long Hauling                Garage
Thursday May 30th 1974   11:10 A.M.
Received $100.00 from Don Pruchnitzky
April & May      (         1314 Hancock
           ( JMM      North Braddock
    Handwritten ( 7/15/74   824–0347
    Notations   ( 183–14

Mr. Irvin testified at the trial that he received money, which he inserted into Government Exhibit 1(a) and kept in a drawer at home, from Councilman Scarpino and that Scarpino told him that it was from Long Hauling Company. Irvin noted this on the envelope along with certain other information which, although not conveyed to him by any other person, was based upon his belief that the money constituted payments for certain months. As to the Exhibits 2(a) and 3(a), he told of having received money from Councilman Pruchnitzsky on the dates shown and similarly putting it in envelopes on which he made notes. Irvin testified that he personally prepared these envelopes contemporaneously with the receipt of the money from the two Councilmen at the time, date, and place noted on the envelope. Under cross-examination, Irvin admitted that he had testified before two Federal Grand Juries that he received the first payment from Jordan Scarpino in February of 1974. However, the envelope prepared by Irvin at the time he received the money from Scarpino reflected that the payment was made in March of 1974. Both Defendants attacked inconsistencies in Irvin's prior testimony in attempts to impugn Irvin's credibility and impute serious motives to his conduct. In addition, it should be noted that Irvin testified that Hackett had explained to him prior to his receiving any cash payments from any other Councilmen that Borough Council Members had previously been receiving $100 a month on the garbage contract but, due to the smaller amount of the new garbage contract, they were currently receiving only $50 a month. Irvin also testified that Hackett told him "some of the boys were afraid to give him his share on the garbage contract". The $50 a month figure reflected by Irvin's personal notations on the envelopes was corroborated by the tape recordings of the conversations between Hackett and Irvin. When Irvin asked Hackett if the Federal Bureau of Investigation could break down the money to $60 a month, Hackett had explained that they were not getting $60 but were getting $50 because Drabik was cutting himself in. Accordingly, the $250 received by Irvin during March, April, and May, according to the Government's theory

constituted the $50 due for the months of January through May. Thus, Long's statement that payments collected by Irvin and Hackett on October 16, 1974 "takes you up to October" clearly indicated that the envelopes contained the cash payments for June, July, August and September.

■ Therefore, the notations on the envelopes, as explained by Irvin, were highly relevant to the issues involved. Counsel for the Defendants seemed to admit this, for they object primarily to the fact that the information with respect to the receipt of the money from Scarpino and Pruchnitzsky was hearsay. The trouble with this is that Irvin himself testified that he had received the money from Scarpino and Pruchnitzsky and this was therefore not hearsay. Their statements that the money was from Long Hauling Company was within the limitations of admissibility of statements of co-conspirators to those made "during the course and in the furtherance of the conspiracy" as set forth in Federal Rules of Evidence 801(d)(2)(E). Such statements have been admitted even though no conspiracy was charged. *United States v. Richardson*, 477 F.2d 1280 (8th Cir. 1973). In *United States v. Olweiss*, 138 F.2d 798 (2d Cir. 1943), *cert. denied* 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944), Judge Learned Hand relied on the rule as set forth by the Supreme Court in *Hitchman Coal & Coke Co. v. Mitchell*, 245 U.S. 229, 249, 38 S.Ct. 65, 72, 62 L.Ed. 260 (1917) which stated:

> "The rule of evidence is commonly applied in criminal cases, but is of general operation; indeed, it originated in the law of partnership. It depends upon the principle that when any number of persons associate themselves together in the prosecution of a common plan or enterprise, lawful or unlawful, from the very act of association there arises a kind of partnership, each member being constituted the agent of all, so that the act or declaration of one, in furtherance of the common object, is the act of all, and is admissible as primary and original evidence against them."

Here, the evidence of concerted action between the various Councilmen and Long was amply demonstrated. That being so, the statements of Scarpino and Pruchnitzsky that the money came from Long was clearly admissible. *See also United States v. Williams*, 435 F.2d 642 at p. 645 (9th Cir. 1970). In any event in the light of Irvin's testimony as to this whole matter, any claimed error would have been harmless.

■ It is also alleged that the Court erred in denying Defendants' Motion for the Withdrawal of a Juror when the prosecutor elicited information from Irvin that the Defendant Long was "still paying off" to the municipalities of North Braddock, Rankin, Munhall, and Homestead. No further information was available to the Government as shown in evidence concerning whether said "payments" were legal, although the implication was clear that the "paying off" was not legal and thus there was conveyed to the jury a possible criminal activity on the part of the Defendant Long, which criminal activity was over and above charges of perjury and obstructing justice being heard by the Court. However, as stated at the time of the Defendants' objections, such testimony was held admissible to show the motive, intent, and knowledge, the plan or design, and that the story of the Defendants concerning the "raffle tickets" was a contrived explanation for the money in the envelopes rather than being the truth of the situation. The Government was thus entitled to indicate or suggest to the jury that the Defendant Long was here knowingly engaged in criminal activity and that the payment was part of a design or course of conduct with which the Defendant Long was very familiar.

## III. THE CHARGE OF THE COURT

■ The Defendants first complain that the Court erred in charging the jury to the effect that the "crux of the case" is whether the initial transaction involved the sale of raffle tickets when the crux of the case was whether "the defendant Francis P. Long did in fact make 'bribes or payoffs' to councilmen of North Braddock Borough".

We must constantly keep in mind that this was not a case charging bribes or payoffs to councilmen but, to the contrary, involved obstruction of justice for lying about the situation. If the jury believed that in fact the money was given for raffle tickets, then the obstruction of justice and all the rest of the Government's case fell because their answers would have been truthful and there would have been no basis for a guilty verdict. In considering the charge as a whole, as we are required to do, it is apparent that the Court's Charge was correct in focusing on the true purpose of the payment of the money.

■ The Defendants next contend that the Court erred in refusing to charge the jury, as requested, that they could not be found guilty of the charge of perjury unless or until the jury had first found beyond a reasonable doubt that Francis P. Long had, in fact, engaged in "bribery or payoffs" with the Councilmen of North Braddock Borough. At first, the statements seem to present a correct charge for the jury to consider. But it was not charged in this case that the Defendants were guilty of bribery or payoffs, and the Charge of the Court correctly focused upon the indictment charges of obstruction of justice and perjury, explaining very carefully to the jury exactly what the various terms meant.

■ Defendants, without merit, further contend that undue emphasis was placed around the raffle ticket story by reading a portion of the indictment to the jury pertaining to the alleged fabrication of a "cover story". An analysis of that use of the indictment shows that it was brought to the attention of the jury solely so they could focus on the exact charges in this case. The same may be said as to the Court's definitions of "payoffs" and "kickbacks" which, although the Circuit has indicated are not words of art, are still words which were necessary to be defined for the jury for their proper consideration of factual issues involved in the specific charges set forth in this indictment.

The final allegation was that the Court erred in admitting Government Exhibits 1 through 38 before the testimony of Norman Irvin and without proper foundation. Agent Edward Stewart's testimony had laid proper foundation for the admission of all of these Exhibits, and thus there was no error in admitting them. Furthermore, Norman Irvin testified at length and the Defendants can show no prejudice by their admission.

An appropriate Order will be entered.