UNITED STATES of America, Appellee,

v.

Robert DeVAUGN, Appellant.

No. 892, Docket 78-1025.

United States Court of Appeals, Second Circuit.

Argued May 3, 1978.

Decided July 17, 1978.

David J. Gottlieb, New York City (Martin Erdmann, Federal Defenders Services Unit, The Legal Aid Society, New York City, of counsel), for appellant.

David C. Patterson, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MOORE, OAKES and GURFEIN, Circuit Judges.

OAKES, Circuit Judge:

Appellant was both tried and convicted on only one count of heroin distribution in the United States District Court for the Southern District of New York before Vincent L. Broderick, Judge, and a jury.[1] The charge was solely a substantive one[2] for distribution of 16.45 grams of heroin on June 22, 1976, in violation of 21 U.S.C. §§ 812, 841(a)(1) and 841(b)(1)(A). Appellant's first trial, which proceeded with codefendant James "Doc" Payton, ended in jury disagreement and a consequent mistrial. Only appellant was retried since Payton suffered an apparent heart attack several days before the second trial. At the retrial, evidence of a taped telephone conversation between a Drug Enforcement Administration (DEA) agent and Payton, the conversation occurring *after* the alleged distribution had been made, was admitted over appellant's objection. Because the evidence was introduced in violation of *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 S.Ct. 790 (1949), we reverse and remand for a new trial.

Evidence viewed in the light most favorable to the Government establishes that in May, 1976, DEA Agent Mary Buckley, claiming to be in the drug business, met Payton in the Red Carpet Lounge, a bar on Amsterdam Avenue and 85th Street in Manhattan. At a subsequent encounter, Buckley told Payton that she had access to quinine, a "cutting" agent used in heroin sales. The following day, June 18, Payton introduced appellant as a person interested in purchasing four pounds of quinine; appellant offered Agent Buckley an even ounce of heroin for the quinine. While under surveillance by several DEA agents, Agent Buckley brought the quinine to the Red Carpet on June 22, 1976. Payton then explained they would have to go uptown to pick up "the package." Payton and De-Vaugn were in one car, Buckley in another. By the time they reached 153rd Street and Broadway, DeVaugn had spotted one or more surveillance cars. As a result the deal was postponed, and the parties agreed to rendezvous back at the Red Carpet. There, Payton and Buckley awaited DeVaugn. A couple of hours later, DeVaugn arrived, at which point Buckley went outside to fetch the quinine. When she returned, she placed it on the floor by the booth where Payton and DeVaugn were sitting. Payton in turn gave her the heroin, but she objected that it was not a full ounce. DeVaugn replied that it was a "spoon ounce,"[3] and Payton assured her that it would "take a three cut."[4] As Buckley prepared to leave the bar, Payton told her to call him back if she was "not happy" with the heroin. She said that she "definitely" would because she "didn't think it was what [she] wanted."

About two hours later, Buckley telephoned Payton on her undercover line so that the call was taped. The conversation focused on Buckley's assurances that she was "all right" in the sense that she was

---

1. The original indictment had charged two substantive violations and a conspiracy covering both distributions. Two superseding indictments each charged one conspiracy and one distribution count. DeVaugn was tried on only the distribution count of one of the superseding indictments.

2. Judge Broderick tried only the substantive count for the stated reason that the conspiracy count unnecessarily complicated the case.

3. A spoon ounce is an ounce measured by spoonsful rather than by a scale.

4. The phrase "to take a three cut" means that the heroin can be diluted three times with an adulterant and still be saleable on the street.

not either wanted by or working for the police; she and Payton also arranged a meeting for the following day. While De-Vaugn and heroin were mentioned by Agent Buckley, Payton refused to discuss either. Appellant objected to the introduction into evidence of this telephone call on the basis that any conspiracy between DeVaugn and Payton had ended with the transfer of the heroin. However, the court admitted the taped conversation, finding "at least two bases" that in fact "the conspiracy was continuing": (1) "in [the Payton-DeVaugn-Buckley] conversation at the time of the exchange there was provision made for further dealings with respect to that specific transaction"; and (2) "[s]econdly, [the district judge was] not at all sure that this conspiracy is limited by the single transaction with respect to which there has been evidence."

Doubtless the trial court had in mind the gloss placed on *Krulewitch* by subsequent Supreme Court cases. *Krulewitch* of course held post-conspiracy hearsay statements inadmissible against coconspirators other than the declarant. Since *Krulewitch,* the Supreme Court has determined that post-conspiracy *conduct* is admissible to show conspiratorial intent, *Lutwak v. United States,* 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and that post-conspiracy statements are admissible when not offered to prove the truth of the declaration be-

cause they are not hearsay, *Anderson v. United States,* 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). In addition, this court has held that real evidence found after the termination of the conspiracy is admissible to prove either the prior existence of the conspiracy, *United States v. Tramunti,* 513 F.2d 1087, 116 (2d Cir.) (narcotics seized after termination of conspiracy admissible), *cert. denied,* 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975), or the prior state of mind to participate in the conspiracy, *United States v. Bermudez,* 526 F.2d 89, 96 (2d Cir. 1975) (traces of narcotics and narcotics related equipment seized after termination of conspiracy admissible), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976). *See also* Fed.R.Evid. 801(d)(2)(E).

It is, however, important to recall that the gloss on *Krulewitch* has not undercut the *Krulewitch* rule itself.[5] There is an inadequate factual basis for concluding that any conspiracy which might have existed was continuing. The record undercuts both of the bases relied on by the district judge for finding a continuing conspiracy.

First, there is not a smidgen of evidence that, having delivered the heroin, DeVaugn was engaged in a continuing enterprise with Doc Payton. That ground for admission, therefore, is without foundation.[6]

---

5. In *Krulewitch,* Mr. Justice Jackson, no mean prosecutor himself, wrote one of his most penetrating and forceful concurrences, an opinion in which Justices Frankfurter and Murphy joined:

   This case illustrates a present drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling and pervasive offense. Its history exemplifies the "tendency of a principle to expand itself to the limit of its logic."

   *Krulewitch v. United States,* 336 U.S. at 445, 69 S.Ct. at 719. (Jackson, J., concurring) (footnote omitted). Mr. Justice Jackson elaborated further:

   Conspirators, long after the contemplated offense is complete, after perhaps they have fallen out and become enemies, may still incriminate each other by deliberately harmful, but unsworn declarations, or unintentionally by casual conversations out of court. On the theory that the law will impute to the confed-

erates a continuing conspiracy to defeat justice, one conceivably could be bound by another's unauthorized and unknown commission of perjury, bribery of a juror or witness, or even putting an incorrigible witness with damaging information out of the way.

   Moreover, the assumption of an indefinitely continuing offense would result in an indeterminate extension of the statute of limitations.

   *Id.* at 456, 69 S.Ct. at 724.

6. The Government argues that because Payton's relationship with Buckley was a continuing one and that because there was no evidence of Payton's having any other supplier than DeVaugn it must be presumed that DeVaugn was a member of a continuing conspiracy envisaging additional transactions. Brief for Appellee at 10. The facts of this case do not support the Government's position, even with the most charitable of inferences. There is no evidence that Payton and Buckley agreed to

And second, the judge's suggestion that the transaction was still pending because Payton's conversation with Agent Buckley before she left the Red Carpet indicated that she was to telephone if she was not satisfied with the amount or quality of the heroin and that she "definitely" had in mind doing just that stands on no better footing. From the testimony, it cannot be inferred that appellant was present and heard the Buckley-Payton conversation which transpired as or after Buckley left the lounge.[7] But even if DeVaugn did hear it, there is no indication that he participated in or assented to the agreement between Buckley and DeVaugn for the former to call back if she was not satisfied with the heroin. There is not a shred of evidence that appellant agreed with Payton on any past or future transaction or on the callback with respect to this one.[8] In short, the rule in *Krulewitch* controls because the telephone conversation, offered for the truth of the matters asserted, occurred after the time when the object of the conspiracy had ostensibly been achieved and when there was no evidence that the conspiracy was continuing. Thus, the evidence of the telephone call should not have been received.

As a last line of defense, the Government invokes the harmless error doctrine. However, we do not see how the error can be considered harmless since it was heavily relied on by both the Government and the jury. The Government's argument in summation focused extensively on this telephone conversation to corroborate Agent Buckley:

> Still later in the evening, Mary Buckley gets another call at that DEA telephone number at the Drug Enforcement Administration from Doc Payton, and as you will recall he tells her that he has been followed again, apparently, when he went back uptown with Mr. DeVaugn, and he wants to know if she's all right. Translated: Are you hot? That the cops have some reason for following you. And are you a cop? She says that she was all right.
>
> The other interesting thing about the call, she tries to talk about the deal, the heroin exchanged, and Payton won't talk. Four or five or six times he says, "Not

more than one transaction. As Judge Friendly noted in *United States v. Borelli*, 336 F.2d 376, 384 (2d Cir. 1964):

> But a sale or a purchase scarcely constitutes a sufficient basis for inferring agreement to cooperate with the opposite parties for whatever period they continue to deal in this type of contraband unless some such understanding is evidenced by other conduct which accompanies or supplements the transaction.

Moreover, given the limited quantity of narcotics involved in this case and given the quantities of narcotics and numbers of dealers available in New York generally, *see Carmona v. Ward* (2d Cir. 1978), 576 F.2d 405, 412, 415, Payton might have had a myriad of suppliers.

7. In admitting the telephone call into evidence, the judge said:

> At a conference in the Red Carpet Lounge between Miss Buckley and Mr. DeVaugn and Mr. Payton, Payton said something to the effect that if she had problems to be in touch.
>
> He regarded the conspiracy as continuing. Presumably DeVaugn who sat there and heard him make that undertaking to do something if there were problems presumed it to be continuing.

That DeVaugn "[p]resumably" heard the undertaking is not a basis for concluding that he in fact did. There is no fact in the record indicating that the Buckley-Payton conversation transpired in appellant's presence. While a trial judge's findings in respect to preliminary rulings on evidence are to be given presumptive weight, they must be based on some evidence. *See McCormick's Handbook of the Law of Evidence* § 267, at 645 n. 26 (Cleary ed. 1972). Buckley's testimony, if anything, suggests that DeVaugn was not present when the undertaking was made:

> Q. Now, after this conversation what did you do?
> A. After this conversation, I took the package they had given me of the heroin and I put it in my purse and I left the quinine on the floor where I first put it, and I left the bar.
> And Mr. Payton told me at this time that if I was not happy with it, to call him back at the bar, that he would be there.
> I told him I would definitely call him back because I didn't think it was what I wanted.

8. Nor is there any evidence that appellant agreed with Buckley on any other transactions or on a callback as to this one, though any such agreement may have been immaterial. *See United States v. Rosenblatt*, 554 F.2d 36, 38 (2d Cir. 1977) (there can be no conspiracy between government agent and defendant).

over the phone; face to face," which explains why there was nothing in those telephone conversations. Mr. Payton was much too smart for that.

Similarly, the jury must have considered the telephone call important. It requested "[t]he testimony of M. Buckley, June 22nd; indictment; call made by Payton to Buckley after sale." The tape of the telephone call was then replayed to the jury, probably enhancing its dramatic effect. The cumulative effect of the prosecution's substantial reliance on the telephone call and the jury's consequent attention to it precludes a finding of harmless error.

Judgment reversed. New trial ordered.

MOORE, Circuit Judge (dissenting):

In *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir. June 30, 1978), we quite accurately said: "It is not always easy to decide, however, when a conspiracy has achieved its purposes". However, I believe that this is an evidentiary area for discretionary oversight by the trial judge, not entirely impervious to review, which should carry a strong inference that the discretion was fairly exercised. There can be no question but that DeVaugn, Payton and agent Buckley were together at the Red Carpet Lounge when the heroin was delivered. But at the very time of delivery the transaction was kept open because Buckley evinced her possible dissatisfaction with her purchase and, on this subject, would call back. The telephone call, only two hours later, from Buckley to Payton was pursuant to that understanding.

The end of a narcotics transaction of this sort does not necessarily occur with the precision of the click of a stopwatch, as at the end of a race. Here at the time of delivery further events were contemplated. Furthermore, the presumption of a continuing state of facts comes into play, namely, DeVaugn's continued presence at the scene of transaction. Therefore, I am unwilling to indulge in an appellate assumption without supporting proof that DeVaugn immediately upon delivery of the heroin absented himself from the group or placed himself out of earshot of Buckley's stated reservations.

In short, in my opinion, the evidence before the trial judge justified his belief that the transaction had not ended upon the mere handing over of the package, and appellate courts should not overturn jury verdicts by substituting their discretionary evidentiary ruling for that of the trial judge. Hence, I would affirm.