**UNITED STATES of America, Appellee,**

v.

**Ronald LYLES, Jesse Johnson, Carlos Holder and Benjamin Dunham, Defendants-Appellants.**

Nos. 104 to 106, 115, Docket Nos. 78–1184 to 78–1186, 78–1193.

United States Court of Appeals, Second Circuit.

Argued Sept. 11, 1978.

Decided Jan. 31, 1979.

Certiorari Denied March 26, 1979.
See 99 S.Ct. 1537, 1545.

H. Elliot Wales, New York City (Jerome Lewis, Miami, Fla., of counsel), for defendant-appellant Lyles.

Kenneth J. Kaplan, New York City (Kaplan & Katzberg, New York City, of counsel), for defendant-appellant Johnson.

Paul B. Bergman, New York City, for defendant-appellant Holder.

Phylis Skloot Bamberger, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant Dunham.

Richard Appleby, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y. (David G. Trager, U. S. Atty., Mary McGowan Davis, Asst. U. S. Atty., Eastern District of New York, Brooklyn, N. Y., of counsel), for the United States of America.

Before OAKES, GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

Ronald Lyles, Jesse Johnson, Benjamin Dunham and Carlos Holder were convicted, after a joint jury trial in the United States District Court for the Eastern District of New York, Eugene Nickerson, *Judge*, of conspiring to distribute heroin in violation of 21 U.S.C. § 846.[1] Although the four appeals raise a variety of legal issues, we hold that nothing in the record before us warrants reversal. The judgments of conviction are hereby affirmed.

## I. *Background.*

Appellants do not challenge the sufficiency of the evidence, which tended to prove the following. In 1972 Warren Fesperman was engaged in the business of selling quinine to various narcotics dealers for use in "cutting" pure heroin. Among his New York purchasers was Jesse Johnson who, in the course of their dealings, asked Fesperman if he knew of any new sources of heroin. Fesperman replied that he would attempt to locate a connection for Johnson. He was as good as his word.

Returning home to North Carolina, Fesperman learned that Carlos Holder, of Yuma, Arizona, could supply large quantities of heroin. In late 1972, Fesperman flew to Arizona to meet Holder, who informed Fesperman that he could supply heroin for $35,000 per kilogram. Fesperman returned to New York with a sample of Holder's heroin and delivered it to Johnson, who promised to get in touch with Fesperman after Ronald Lyles, Johnson's partner, had examined it. The sample was apparently satisfactory, for shortly thereafter Johnson met with Fesperman and gave him $38,000 to purchase a kilogram of heroin from Holder; the extra $3,000 was Fesperman's commission. Fesperman again flew to Arizona to meet Holder, and the two then travelled to Mexico where Holder introduced Fesperman to "Luis," his source of supply. Subsequently, Holder gave Fesperman a kilogram of heroin in exchange for $35,000. Fesperman delivered the heroin to Johnson at a New York City motel.

In October, 1972, Johnson again gave Fesperman $38,000 and told him to purchase another kilogram of heroin from Holder. After making this purchase, Fesperman returned to North Carolina and placed the heroin inside the inner tube of the spare tire in his automobile. At Johnson's direction he drove the car to Benjamin Dunham's gas station in Brooklyn, New York. Dunham removed the heroin from the tire and kept it in his storeroom until it was picked up by Johnson. After this particular transaction, Johnson introduced Fesperman to his partner, Lyles, who handed Fesperman $6,000 in cash, as an additional commission, saying that he and Johnson were pleased with the quality of the heroin being delivered.

In November, 1972, Holder flew to North Carolina with a kilogram of heroin. Holder and Fesperman then delivered the heroin to Lyles at his home in Brooklyn. Lyles again gave Fesperman a $6,000 commission in cash.

---

1. Lyles, Johnson and Holder were sentenced to eight-year terms of imprisonment and eight-year terms of special parole; Dunham received two years' imprisonment and five years' special parole. Lyles and Dunham are free on bail pending disposition of their appeals; Johnson and Holder are currently incarcerated on unrelated convictions.

Approximately twenty-five such sales took place between late 1972, when Fesperman arranged the first purchase for Johnson, and July, 1974, when Fesperman was arrested for selling two ounces of heroin to an undercover agent. Although various couriers working for Holder or for Johnson and Lyles often participated in the actual transportation of the drugs, the transactions generally followed one of the patterns sketched above. One of the couriers involved was Annco Holder, appellant Holder's wife.

After his arrest, Fesperman agreed to become an undercover informant for the Drug Enforcement Administration. Beginning in July of 1975, Fesperman recontacted Lyles and the two Holders. Tape recordings made during Fesperman's meetings and telephone conversations with these three former co-conspirators indicate that they retained an active interest in the illegal drug business. These tapes figure prominently in the appeals before us, as they did in the trial below.

## II. *Rule 30 Claim: Lyles.*

Appellant Lyles attacks his conviction on only one ground. Prior to the summations, the district judge discussed with counsel the charge he intended to deliver to the jury. After the summations were completed, however, and after further discussions with the attorneys, the court delivered a charge somewhat different from the one he had previously proposed. Lyles claims that this was reversible error.

**2.** At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. *The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury*, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be

Fed.R.Crim.P. 30[2] provides that the trial court shall inform counsel of its proposed action upon submitted requests for instructions before counsel make their closing arguments. Such a procedure permits counsel to conform their arguments to the law as it will thereafter be presented by the judge to the jury. *United States v. Tourine*, 428 F.2d 865, 869 (2d Cir. 1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971); *United States v. Clay*, 495 F.2d 700, 707 (7th Cir.), *cert. denied*, 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974); 8A Moore's Federal Practice ¶ 30.-03[2]. Clearly this purpose is frustrated if the judge, after informing counsel of his proposed charge, then changes the charge after the summations are completed. But it is settled law in this Circuit that reversal is appropriate only when a defendant can demonstrate that a Rule 30 lapse has resulted in prejudice. *United States v. Conlin*, 551 F.2d 534, 539 (2d Cir.), *cert. denied*, 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); *United States v. Fernandez*, 456 F.2d 638, 644 (2d Cir. 1972). *See Hamling v. United States*, 418 U.S. 87, 134–35, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (noting the soundness of such an approach to Rule 30). Applying this test to the record before us, we conclude that Lyles was not prejudiced by the district judge's belated revision of the charge and that Lyles' conviction must stand.

The instruction at issue, requested by Lyles' co-defendant Carlos Holder, was at first accepted by the district court but then omitted from the charge delivered.[3] It con-

given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.
Fed.R.Crim.P. 30 (emphasis added).

**3.** The record shows that after summations were completed, the prosecutor objected that the proposed instruction on similar act evidence was too restrictive and did not reflect current Second Circuit law. To resolve the issue, the judge held two colloquies out of the presence of the jury, with all counsel participating. During the course of these discussions Judge Nickerson on three occasions asked for objections and exceptions to his decision to excise two paragraphs from the similar act evidence instructions which had been request-

cerned the purposes for which the jury might consider the taped evidence of various conversations between Fesperman and several of the alleged conspirators: Lyles, Carlos Holder, and Annco Holder. The taped conversations were held in 1975—after the conspiracy charged in the indictment had ended. In the government's view, the conversations revealed that in 1975 Lyles and Holder were trying to arrange drug transactions along the same lines as those successfully completed in 1972–74. Holder's counsel requested an instruction stressing that the tapes, as similar act evidence, could be considered only as bearing on a defendant's state of mind in doing the act charged, and that before making such a state of mind determination the jury would have to find beyond a reasonable doubt, on the basis of *other* evidence, that the defendant had in fact done the act charged.[4] The charge actually delivered stated instead that the defendants were not on trial for any act not alleged in the indictment, that similar acts were not admissible to prove character, but that such acts could be considered as evidence of the state of mind with which a defendant did the act charged or as evidence of a common plan.[5]

Although Lyles maintains that the judge would have been within his discretion had he more explicitly limited the jury's consideration of the tapes by delivering the proposed instruction, and that he should have done so, Lyles does not now contend that

ed by Holder and previously approved by the court. Although Mr. Jerome Lewis, Lyles' attorney, objected to the rephrased charge as not accurately presenting the law on similar act evidence, he did not then raise the Rule 30 argument now put forward on appeal or in any other manner alert the judge to the possibility that the effectiveness of his summation would be compromised by the change in the charge. Only after the judge had called the jury back into the courtroom did Mr. Lewis move for a mistrial and state that Lyles' defense had been prejudiced.

4. After all the requests to charge had been submitted, and before the prosecution rested, the district judge gave counsel an opportunity to consider, and make objections to, his proposed instructions, which substantially incorporated the similar act instruction requested by Holder's counsel. The proposed charge read in pertinent part:

The government has introduced evidence, including tape recordings, of acts allegedly committed by some of the defendants during a period of time after the end of the alleged conspiracy with which the defendants are charged. As I explained when this evidence was introduced, you may consider this material only for very limited purposes, and I would like to review with you again the proper use of this evidence.

Evidence that a defendant may have committed an act at one time, or on one occasion is not any evidence or proof whatever that a similar act was done at another time, or on another occasion. That is to say, evidence that a defendant may have committed subsequent acts similar to the acts charged in the indictment may not be considered by you in determining whether the defendant committed the act charged in the indictment, that is, participation in a conspiracy between June 1972 and October 1974.

Nor may evidence of alleged subsequent acts of a like nature be considered by you for any purpose whatever, unless you first find that the other evidence in the case, standing alone, establishes beyond a reasonable doubt that the defendant did the particular act charged in the indictment.

If the jury should find beyond a reasonable doubt from other evidence in the case that the accused did the act charged in the indictment . . . then the jury may consider evidence as to an alleged subsequent act of a like nature, in determining the state of mind or intent with which the accused did the act charged in the indictment. And where proof of an alleged subsequent act of a like nature is established by evidence which is clear and conclusive, the jury may, but is not obliged to, draw the inference and find that, in doing the act charged in the indictment under deliberation, the accused acted wilfully and with specific intent, and not because of mistake or accident or other innocent reason.

5. The charge delivered included the first paragraph set out in the proposed instruction, note 4, *supra*, and continued:

The defendants are not on trial for any act or conduct not alleged in the indictment.

Evidence that a defendant may have committed an act at one time or on one occasion is not admissible to prove the character of a defendant in order to show that he acted in conformity therewith. However, the jury may consider evidence as to the alleged subsequent act of a like nature as evidence of the state of mind, knowledge or intent with which the accused did the act contained in the indictment, and may be considered as evidence of any common plan of the defendant.

the less restrictive instruction actually presented was erroneous.[6] Instead, he argues that the court prejudiced his defense by permitting his attorney to rely during summation on the court's unfilfulled indications regarding its intended jury charge. Lyles asserts that, had accurate information regarding the charge been available, his attorney (1) would not have made incorrect statements regarding the forthcoming charge and thus would not have damaged his credibility in the eyes of the jury, and (2) would have spent more summation time attacking the taped evidence. Our study of the record below casts considerable doubt on the contention that Lyles' attorney would have changed his argument significantly or that any changes made in response to the charge revision would have had more than a negligible impact on the jury.

The summation by Lyles' attorney, Mr. Jerome Lewis, covered fifty pages of trial transcript, was precisely as long as the government's summation, and was lengthier than that of any other defense counsel. Mr. Lewis immediately addressed himself to the taped evidence, pointing out that the word "heroin" appeared on none of the tapes on which Lyles' voice was heard. Building on this fact, Mr. Lewis advanced the theory that the conversations between Fesperman and Lyles concerned not narcotics but stolen chemicals. Approximately the first twenty percent of his summation was devoted to this theme—to which he later returned.

The bulk of the summation was devoted to an attack on Fesperman's credibility. In the course of this attack, Mr. Lewis made reference to the forthcoming charge, prompting the following exchange:

[Mr. Lewis]: And before you can get to consideration of the tapes the Court will charge you that first you must find that you believe the testimony of Fesperman beyond a reasonable doubt. And then you use the tapes to go into the intent and the motive of the particular defendant involved.

And I say this to you, ladies and gentlemen, with every ounce of sincerity at my command, if you believe Fesperman's testimony beyond a reasonable doubt don't bother looking at the tapes, find him guilty, because it would be an exercise in futility. If you believe the man—if you can believe his testimony beyond a reasonable doubt—then he is guilty. Don't look at intent. If my man sold or purchased and was involved in narcotics then find him guilty. But you have got to do it solely on the testimony—solely on the testimony of Warren Fesperman. Those tapes are not corroboration of his testimony. They are not independent evidence. They only are to be evaluated by you if once you establish in your minds that Lyles is guilty beyond a reasonable doubt based on the testimony of Fesperman. And if you say to yourselves, no, we don't believe him; we can't find Lyles guilty on the testimony beyond a reasonable doubt as adduced by Fesperman—

Mr. Appleby [Assistant U. S. Attorney]: Your Honor, one second. I do not think that is an accurate statement of the law.

The Court: No, I will give you the law. The attorneys are not to give you the law.

Mr. Lewis: I'm trying to tell the jury what I understand what your Honor's charge is.

The Court: I will give you the law. Don't take it from the attorneys. Take it from the Court.

Mr. Lewis: That is absolutely right.

The Court: Thank you.

At a later point in his argument Mr. Lewis told the jury:

[B]efore you consider these tapes, you must sit down and evaluate the credibility and say to yourself, is Ronnie Lyles guilty, based on the testimony of Warren Fesperman, beyond a reasonable doubt?

---

6. The admissibility of the tapes under the similar act evidence rationale is discussed in section IV, *infra*.

I ask you to listen very closely to Judge Nickerson's charge on that particular phase of the case.

We have scrutinized Mr. Lewis' summation with care. In the lengthy and colorful presentation, studded with references to. Lewis' impending retirement, the Gettysburg Address, Martin Luther King, Communist China and Mr. Justice Brandeis, we find no other statement inconsistent with the charge delivered. The statements just quoted, which were, as Lyles contends, inconsistent with the charge delivered, *also* misstated the charge proposed.[7] In addition, during the summation, the court cautioned the jury, with Mr. Lewis' approval, to take the law from the court and not from counsel. Under these circumstances we find no basis on which to conclude that Mr. Lewis' credibility in the eyes of the jury was compromised by the tardy revision of the charge.

Neither are we persuaded that Mr. Lewis would have significantly altered his summation had he known how the court was actually going to charge the jury. It is difficult to see how the summation might have differed in content, focus or tone. Mr. Lewis offered the jury an exculpatory interpretation of the taped conversations which, if believed, would have buttressed his attempt during cross-examination of Fesperman to characterize all the Lyles-Fesperman dealings as unrelated to narcotics. Mr. Lewis vigorously attacked Fesperman's credibility, which attack would tend to cast doubt on Fesperman's contrary characterization of the taped conversations as heroin deals. Mr. Lewis' argument was not restricted in any way; on the contrary he was permitted to get before the jury a version of the law somewhat more favorable to his client than that embodied in the charge. The charge did not directly contradict Mr. Lewis' version, but rather failed to restate it. Therefore, "we do not believe that this departure

from the strict terms of Rule 30 generated such fundamental prejudice to the defendant as to constitute reversible error." *United States v. Hartman,* 409 F.2d 198, 199 (3d Cir. 1969). *Compare United States v. Clay, supra,* 495 F.2d at 708 ("inconceivable that notification of the alteration in the instruction would have affected the tenor of the defense argument") *and United States v. Scheffer,* 463 F.2d 567, 573–74 (5th Cir.), *cert. denied,* 409 U.S. 984, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972) (despite late change in instructions counsel not restricted in making closing argument) *with United States v. Harvill,* 501 F.2d 295 (9th Cir. 1974) (change in charge prejudicial where effectiveness of defense counsel's argument may have been impaired) *and United States v. Mendoza,* 473 F.2d 697, 700–701 (5th Cir. 1973) (no reasonable certainty that outcome would be the same if defense had based argument on accurate information regarding charge).

Because Lyles has failed to carry his burden of demonstrating prejudice resulting from the trial court's departure from Rule 30, we need not decide whether Mr. Lewis waived any objection to the court's revision of the charge by failing to object in a timely manner, to request a chance to reopen his summation, or to submit curative instructions to the court.[8]

### III. *Severance Claims: Johnson and Dunham.*

*Johnson*

 Appellant Johnson claims that the trial court erred in denying his motion for severance. Under the law of this Circuit, in order to obtain a reversal of his conviction on this ground, Johnson must show that the trial court's refusal to sever his case from the trial of his co-defendants was so unfairly prejudicial as to constitute an abuse of discretion. "[W]e are reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substan-

---

7. In neither the proposed nor the actual charge did the court state that before they could consider the tapes the jurors would have to find that they believed the testimony of Fesperman beyond a reasonable doubt. Nor did either

version of the charge directly address the issue of use of the tapes as corroboration of Fesperman's testimony.

8. *See* note 3, *supra.*

tial prejudice. . . . It is not sufficient merely to show that the accused would have had a better chance for acquittal at a separate trial." *United States v. Stirling,* 571 F.2d 708, 733 (2d Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978) (citations omitted); *United States v. Corr,* 543 F.2d 1042, 1052 (2d Cir. 1976); *United States v. Papadakis,* 510 F.2d 287, 300–301 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975).

■ Johnson attempts to demonstrate the requisite substantial prejudice by pointing to the similar act evidence admitted against his co-defendants, Lyles and Holder—the tapes of Fesperman's conversations with Lyles, Holder, and Holder's wife. Johnson claims that although the evidence was not admitted against him and the court provided limiting instructions to the jury, he was indelibly tarred with the brush used on Lyles and Holder. However, "[t]he fact that evidence may be admissible against one defendant but not against others does not require separate trials." *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir. 1978). Johnson seeks to avoid application of this rule by speculating that because of the "inextricable relationship" between Lyles and Johnson the jury would necessarily view the post-conspiracy conversations between Lyles and Fesperman as a continuation of the Lyles-Johnson partnership. However, "[s]uch contentions take insufficient account of the intelligence and conscientiousness of the jury, the effective efforts of the judge to keep it on the beam, [and] the skill of defense counsel . . . ." *United States v. DeSapio,* 435 F.2d 272, 280 (2d Cir. 1970), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971) (citation omitted). Even where damaging similar act evidence introduced against one defendant is not clearly unrelated to a co-defendant, cautionary instructions have been held sufficient protection. *United States v. Rosenwasser,* 550 F.2d 806 (2d Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 73, 54 L.Ed.2d 83 (1977).

■ Here, Fesperman, the government's chief witness, specifically testified that he had not met with or spoken to Johnson after July, 1973.[9] The absence of any reference to Johnson on the tapes was underscored for the jury by Johnson's counsel. The case was relatively straightforward. Four defendants were tried on a one-count indictment. Three witnesses testified for the government; the defendants chose to present no evidence. The trial judge instructed the jury, both at the time of the admission of the tapes and in his charge, that the tapes were to be considered *only* with regard to the specified defendants. We find no basis for inferring that the jury would be unable to follow clear and timely directions limiting their consideration of easily identifiable pieces of evidence. Thus, the cautionary instructions were sufficient to protect Johnson from substantial prejudice due to jury consideration, in determining his guilt, of similar act evidence admitted against his co-defendants.

■ Johnson argues, however, that prejudicial "spill-over" occurred not only because the jury may have considered the tapes in determining his guilt, but also because the admission of the tapes tended to corroborate Fesperman's testimony, and therefore bolstered Fesperman's credibility. When a similar argument was considered in *United States v. Borelli,* 435 F.2d 500, 502–503 (2d Cir. 1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971), we concluded that "unless joint trials are to be outlawed altogether, we would not hold that this kind of 'prejudice'—the bolstering of the credibility of a prosecution witness—requires severance as a matter of law." It may happen that the general credibility of a prosecution witness is strengthened in any case where he or she offers testimony against two or more defendants and the corroborative evidence against one of the defendants is particularly strong. *Id.; United States v. Lord,* 565 F.2d 831, 839 (2d

---

**9.** The reason for Fesperman's inability to contact Johnson—the latter's incarceration on state charges—was not revealed to the jury.

Cir. 1977). However, such a possibility does not without more necessitate abandonment of the general rule that persons jointly indicted may be jointly tried where the crime charged may be proved against all by sub-stantially similar evidence. "Such a rule conserves judicial resources, alleviates the burdens on citizens serving as jurors, and avoids the necessity of having witnesses reiterate testimony in a series of trials." *United States v. Borelli, supra,* 435 F.2d at 502 (footnote omitted); *United States v. Stirling, supra;* 571 F.2d at 733 (public interest in avoiding "unnecessarily multiplicitous litigation"); *United States v. Arroyo-Angulo,* 580 F.2d 1137, 1144 (2d Cir. 1978) (where crimes charged arose out of same acts and were established by substantially the same evidence, in interest of judicial economy defendants should be tried together absent substantial prejudice).

*Dunham*

In seeking reversal of his conviction, appellant Dunham, like Johnson, relies solely on the denial of his motion for severance. However, he does not argue prejudicial spillover but rather infringement of his right to testify in his own defense. Dunham maintains that, unlike his co-defendants, he had intended to testify at trial, but was prevented from doing so because his case was not severed.

Dunham's participation in the conspiracy charged was relatively minor. On two occasions Dunham had permitted Fesperman to drop off packages at his gas station in Brooklyn, where they were later picked up by Johnson. On another occasion Dunham picked up a package from Fesperman, who met him at a shopping plaza in North Carolina pursuant to Johnson's instructions. Five months later, at a North Carolina motel, Dunham delivered several thousand dollars to Fesperman—a sum promised to Fesperman by Lyles, who had requested that Fesperman arrange another drug purchase.

Fesperman testified that at this last meeting Dunham had said that he wanted the "merchandise" to be good.

After his arrest Dunham did not deny his participation in these transactions. He did insist, however, that all the packages he had seen were wrapped in brown paper, that he had not known what was in them, but that he had thought they might have contained marijuana. The DEA agent to whom Dunham made these admissions testified at trial both as to Dunham's corroboration of Fesperman's account of their dealings and as to Dunham's protestations of ignorance as to their true nature.

■ A few days into the trial, Dunham's counsel requested a bench conference. Counsel informed the court that he had just learned from his client that he had been threatened while working at his gas station. An unknown man had said that Dunham had better not take the witness stand or he would face dire consequences.[10] Counsel explained that Dunham had intended to testify to show the jury that he lacked the requisite knowledge. He argued that taking the stand was Dunham's only hope for an acquittal, but that Dunham's testimony would necessarily inculpate his co-defendants. Counsel told the court that because of the threat Dunham was too frightened to testify as planned.

■ Although we recognize the importance of the opportunity to testify in one's own defense, *United States v. Bentvena,* 319 F.2d 916, 943 (2d Cir.), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963), Dunham has failed to show that a severance of his trial would have facilitated his exercise of that option. There is no basis for the assumption made by Dunham's counsel that the maker of the threats would have no objection to Dunham's testifying at his own trial if that trial were held after the guilt or innocence of the remaining defend-

---

**10.** The record is not clear as to precisely when Dunham's counsel learned of the threat, but we will assume for purposes of this appeal that the request for severance was timely. Although Fed.R.Crim.P. 12(b)(5) requires that requests for severance be made before trial, the court below was authorized by Rule 12(f) to hear the motion. Waiver may be avoided where cause for delay is shown.

ants had been adjudicated. It would appear no less likely that the source of the threats feared that Dunham's "squealing" would have adverse consequences beyond its impact on the verdict. We cannot say that Judge Nickerson's denial of Dunham's severance motion was prejudicial in the absence of any indication that a severance would have enabled Dunham to avoid the difficult choice between the Scylla of not testifying and the Charybdis of unknown "dire consequences."

Dunham has cited no precedents for the granting of the relief requested in this precise situation, but our analysis of an analogous situation provides some guidance. When a defendant seeks severance on the ground that a co-defendant who would offer exculpatory testimony if called to testify at a separate trial will invoke the privilege against testifying at a joint trial, we have identified several relevant considerations, one of which is "the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege . . . ." *United States v. Taylor,* 562 F.2d 1345, 1362 (2d Cir.), *cert. denied,* 432 U.S. 909, 97 S.Ct. 2958, 54 L.Ed.2d 124 (1977), *quoting United States v. Finkelstein,* 526 F.2d 517, 523 (2d Cir. 1975), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). The ability to call witnesses in one's defense and the ability to testify in one's own defense may both be essential to a fair trial, but an alleged infringement of either does not necessitate severance unless there is an indication that severance can cure the problem. Thus, if a co-defendant will invoke the Fifth Amendment at either a joint or a separate trial, the defendant seeking severance will gain nothing and judicial economy will have been sacrificed. *United States v. Carella,* 411 F.2d 729, 731–32 (2d Cir.), *cert. denied,* 396 U.S. 860, 90 S.Ct. 131, 24 L.Ed.2d 112 (1969). Similarly, if Dunham would be deterred from testifying in his own defense at a separate trial, severance would not be appropriate. Dunham has not made a sufficient showing that the threat at issue was directed only to his testifying at a joint trial.

We can see no reason to depart from the rule enunciated in our discussion of Johnson's appeal, *supra,* that leaves the severance decision to the discretion of the trial court, subject to review for abuse of that discretion. The trial court is in a far better position than is the reviewing court to judge the truthfulness of a defendant who alleges that he has received such a threat, to identify the source of an alleged threat, to determine whether severance would prejudice any of the parties involved or promote the fair trial of all defendants, to determine whether a warning or an arrangement for protection would be sufficient to dispel any fear created by such a threat, and to hold a hearing, if warranted, to shed light on any of these factors. In view of the clearly superior ability of the trial judge to weigh these considerations, aided by his personal observation of the parties, the witnesses, and the jury, we hesitate to upset the exercise of a trial court's discretion on the basis of a printed record which can capture only those communications below which have been articulated. *Cf. United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir. 1977) (*en banc*), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978). We cannot conclude that Judge Nickerson exceeded the bounds of that discretion.

Judge Nickerson indicated when the motion was made that since Dunham was not taking the stand at that time a final ruling could be delayed. But despite the court's expressed willingness to reconsider the issue at an appropriate time, the motion was not renewed after presentation of the government's case. Dunham's counsel did not request a hearing for exploration of the relevant factors nor did he follow up on the government's offer to consider giving Dunham protection. This failure to pursue vigorously the severance issue below increases our reluctance to second-guess the trial court's decision. However, whether and when failure to renew the motion would operate as a waiver we leave for

another day.[11] *Cf. United States v. Kaplan,* 554 F.2d 958, 966 (9th Cir.), *cert. denied,* 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977) ("Premature motions to sever not diligently pursued as the prejudicial evidence unfolds cannot serve as insurance against an adverse verdict.").

## IV. Similar Act Evidence and Vicarious Admissions: Holder.

Carlos Holder's appeal raises a close and complex question. Holder contends that the admission of the taped conversations between his wife Annco and Fesperman was prejudicial error.

▆ Under this Circuit's familiar formula, evidence of similar acts is admissible in the discretion of the trial court if it is substantially relevant for a purpose other than merely to show a defendant's criminal character or disposition and if its probative worth outweighs its potential prejudicial impact. *See, e. g., United States v. Gubelman,* 571 F.2d 1252, 1254 (2d Cir.), *cert. denied,* 436 U.S. 948, 98 S.Ct. 2853, 56 L.Ed.2d 790 (1978); *United States v. Benedetto,* 571 F.2d 1246, 1248 (2d Cir. 1978); *United States v. Chestnut,* 533 F.2d 40, 49 (2d Cir.), *cert. denied,* 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976); *United States v. Papadakis, supra,* 510 F.2d at 294. Holder apparently concedes that the government was entitled to prove his participation in a subsequent drug deal transacted in the same manner as those covered by the indictment.[12] Holder's objection is to the manner in which this relevant similar act was proved. In order to evaluate the validity of this objection, we must look not only at the law governing admissibility of similar act evidence but also at the law governing "vicarious admissions" [13] and the law governing the exclusion of relevant evidence

**11.** When a motion for severance has been denied with leave to renew, if a defendant wants to preserve a severance claim for appellate review, it is clearly preferable for the defendant to renew the severance motion when such prejudice has surfaced so that the trial judge is alerted to the fact that the defendant has not chosen to proceed with the trial as a matter of strategy and so that the court may exercise its discretion in ruling on the renewed motion in light of the additional information before it.

**12.** The government relied on two theories to support the introduction of this similar act evidence: modus operandi (plan or design), *United States v. Cavallaro, supra,* 553 F.2d at 305; *United States v. Papadakis, supra,* 510 F.2d at 295; *but see United States v. O'Connor,* 580 F.2d 38 (2d Cir. 1978), and corroboration, *United States v. Williams,* 577 F.2d 188, 192 (2d Cir. 1978).

The admission of similar act evidence is authorized by Fed.R.Evid. 404(b), which provides:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**13.** The term vicarious admissions is here used to refer to statements, offered against a party, which were neither made nor "adopted" by the party. Subsections (C), (D), and (E) of Fed.R. Evid. 801(d)(2) spell out the types of vicarious admissions that may be offered against a party as non-hearsay evidence. Rule 801 reads in pertinent part:

(d) A statement is not hearsay if—

. . . . .

(2) *Admission by party-opponent.* The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity or (B) a statement of which he has manifested his adoption or belief in its truth, or (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

The record below indicates that the government relied on both subsections (D) and (E) in seeking to introduce the Annco tapes; it claimed both that Annco was acting as Carlos' agent and that Annco and Carlos were co-conspirators. The same facts were relied upon to establish both the agency and conspiracy relationships. The court below followed the lead of the government and the defense in treating the conspiracy and agency issues as interchangeable. Because in this case our analysis of the agency issue would parallel our analysis of the conspiracy issue, for the sake of clarity our discussion will focus primarily on the conspiracy rationale for the introduction of the Annco tapes.

whose probative value is outweighed by its potential for prejudice.[14]

When in a criminal case the government seeks, under the co-conspirator rationale, to introduce as an admission the out-of-court statement of a declarant other than the defendant, the trial judge must make a preliminary determination that there is sufficient independent evidence to establish the following: (1) that a conspiracy existed, *United States v. Nixon*, 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); (2) that the conspiracy was still in existence at the time the statement was made, *United States v. DeVaugn*, 579 F.2d 225, 227–28 (2d Cir. 1978); *citing Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949); (3) that the declarations were made in furtherance of the conspiracy, *United States v. Lang*, 589 F.2d 92, 99 (2d Cir. 1978); and (4) that both the declarant and the defendant participated in the conspiracy, *United States v. Cafaro*, 455 F.2d 323, 326 (2d Cir.), *cert. denied*, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed. 117 (1972); *United States v. Calabro*, 449 F.2d 885, 889 (2d Cir. 1971), *cert. denied*, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). While the practicalities of proof may require that a particular statement be admitted subject to connection, that is, subject to an adequate showing of the elements just summarized, "if at the close of the Government's case the connection has not been proved, the court must, upon motion, strike the insufficiently connected item and direct the jury to disregard it." *United States v. Ziegler*, 583 F.2d 77, 80 (2d Cir. 1978), *citing United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970).[15]

The case before us differs in two ways from the typical criminal case in which the government seeks to introduce a vicarious admission. First, in the usual vicarious admission situation, the conspiracy which is relied upon for Rule 801(d)(2)(E) purposes either is the very crime charged or is closely related to the crime charged. It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment.[16] *United States v. Doulin*, 538 F.2d 466, 471 (2d Cir.), *cert. denied*, 429 U.S. 895 (1976). *See also United States v. Ruggiero*, 472 F.2d 599, 607 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973); *United States v. Jones*, 374 F.2d 414, 418 (2d Cir.), *cert. denied*, 389 U.S. 835, 88 S.Ct. 40, 19 L.Ed.2d 95 (1967); *United States v. Olweiss*, 138 F.2d 798, 800 (2d Cir. 1943) (admission of such declarations "does not depend upon the indictment, but is merely an incident of the general principle of agency that the acts of any agent, within the scope of his authority, are competent against his principal"). However in each of the cited cases enunciating this principle the conspiracy introduced into evidence by the government, although not charged, was factually intertwined with the offense for which the defendant was being tried.

---

14. Fed.R.Evid. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

15. The trial court implicitly made the finding required by *United States v. Geaney*, 417 F.2d 1116 (2d Cir. 1969), *cert. denied*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), when it overruled a defense objection to introduction of the Annco tapes. The defense argued that the government had failed to demonstrate a conspiracy or agency relationship between Annco and Carlos. The court apparently disagreed. Because the testimony of Fesperman, if believed, would support a finding of an agency or conspiracy relationship between Carlos and Annco at the time of the conversations, a relationship which was furthered by those conversations, this finding will not be disturbed. *But cf. United States v. Ziegler*, 583 F.2d 77, 80 (2d Cir. 1978).

16. *See* Notes of Committee on the Judiciary, Senate Report No. 93–1277, Note to [Rule 801] Subdivision (d)(2)(E) ("[T]he rule is meant to carry forward the universally accepted doctrine that a joint venturer is considered as a co-conspirator for the purposes of this rule even though no conspiracy has been charged. *United States v. Rinaldi*, 393 F.2d 97, 99 (2d Cir.), *cert. denied*, 393 U.S. 913, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968)").

The second distinction between this case and the more usual vicarious admission case has to do with what the admission is introduced to prove. The typical vicarious admission situation involves government efforts to introduce against a criminal defendant a statement by an alleged agent or co-conspirator which tends directly to prove the commission of the crime charged. *See, e. g., United States v. DeVaugn, supra,* 579 F.2d 225; *United States v. Pacelli,* 491 F.2d 1108, 1115–17 (2d Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974); *United States v. Calabro, supra,* 449 F.2d 885; *United States v. Rinaldi,* 393 F.2d 97, 99 (2d Cir.), *cert. denied,* 393 U.S. 913, 95 S.Ct. 43, 42 L.Ed.2d 49 (1968). Here, in contrast, the vicarious admission was offered to establish only the performance of a similar act, *not* the commission of the crime charged. We view this distinction as crucial.

■ When this Court has reaffirmed its commitment to the inclusory form of the similar act evidence rule, discussed above, what has been so "included" is any *purpose* for the introduction of similar act evidence other than to show criminal character or propensity. The cases adhering to this formula cannot be read to imply that what constitutes an acceptable *method of proving* a similar act is similarly broadly conceived.

Typically, a similar act is established by documentary evidence, such as court records evidencing a prior conviction, or by first-hand testimony—vicarious admissions are not introduced. *See, e. g., United States v. Williams, supra,* 577 F.2d 188; *United States v. Gubelman, supra,* 571 F.2d 1252; and *United States v. Benedetto, supra,* 571 F.2d 1246. In the case of documents, the occurrence of the similar act may not be seriously contested. In the case of first-hand testimony, the jury can reach a decision as to the occurrence of the similar act by evaluating the credibility of witnesses, aided by their observation of direct and cross examination. In the present case, however, in order to get the tapes before the jury, the government had to introduce evidence on issues far removed from the

ultimate issue of guilt. For example, a second conspiracy relationship between Carlos and Annco had to be shown to have existed long after the conspiracy charged had ended. The government also had to show that the taped conversations were held in the course of and in furtherance of the conspiracy. And these factual showings were merely prerequisites to the introduction of evidence, Annco's conversations, which tended to prove the occurrence of the similar act (the second conspiracy). Once established, that similar act was then to be considered by the jury, in a limited fashion, in determining the question of guilt of the crime charged.

■ While the Annco tapes were thus ultimately relevant to the determination of guilt, introduction of vicarious admissions as evidence of similar acts in such a case obviously carries with it serious potential for prejudice in the form of confusion of issues. Such evidence is especially likely to distort the emphasis at trial "away from the crimes covered by the indictment to those not so charged." *United States v. O'Connor,* 580 F.2d 38, 43 (2d Cir. 1978) (footnote omitted). In performing the balancing required for the determination of both the prejudicial character and the probative value of similar act evidence, the length of the chain of inferences necessary to connect evidence with the ultimate fact to be proved is clearly an important factor. *United States v. Ravich,* 421 F.2d 1196, 1204 n. 10 (2d Cir.), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). The greater the danger of prejudice, the more justification must be shown for the introduction of challenged evidence. McCormick, Evidence, § 190, at 453 (2d ed. 1972). In view of the available direct testimony and the available tapes of Holder's own conversations with Fesperman, the prosecutor cannot be said to have had a great need to introduce the Annco tapes. "[C]aution and judgment are called for, and a trial judge faced with another crimes evidence problem should require the Government to explain why the evidence is relevant and necessary." *United States v. O'Connor, supra,* 580 F.2d at 43.

■ We believe that the trial court's decision to admit the Annco tapes was an abuse of the trial court's discretion in evaluating evidence under Rule 403. *United States v. Robinson, supra,* 560 F.2d 507. We hold that the error was harmless, however, and thus, reversal of Holder's conviction is not warranted. The case against Holder was very strong. The jury quickly convicted his co-defendant Johnson, against whom no similar acts were alleged or proved. The similar act allegation against Holder, introduced through the direct testimony of Fesperman, was substantiated by tape recordings of two conversations between Fesperman and Holder, which came in as admissions under Rule 801(d)(2)(A), and which corroborated Fesperman's story. The government spent relatively little summation time on the Annco tapes. Thus the Annco conversations, although more explicitly drug-related than the Carlos conversations, in large part merely served the redundant function of further corroborating the testimony of the witness whom the jury was prepared to believe, as to another defendant, in the absence of *any* taped post-conspiracy conversations. "A nonconstitutional error, as in the case of erroneous admission of similar act evidence, is harmless if it is 'highly probable' that the error did not contribute to the verdict. . . . Where there is overwhelming evidence of guilt, as there was here, erroneous evidentiary rulings on such collateral matters are often harmless." *United States v. Corey,* 566 F.2d 429, 432 (2d Cir. 1977) (citations omitted). *See also United States v. Quinto,* 582 F.2d 224, 235 (2d Cir. 1978) (nonconstitutional error harmless "if 'our conviction is sure that the error did not influence the jury or had but very slight effect,'" *citing United States v. Ruffin,* 575 F.2d 346, 359 (2d Cir. 1978), and *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

■ The other claims raised by Holder are without merit.[17]

17. Holder raised two other issues on appeal; both require little discussion. Holder had bargained with the United States Attorney in Arizona to plead guilty to an unrelated narcotics violation about one month before the indictment in the instant case was handed down by a grand jury in New York. He claims that the United States Attorney's office in Arizona was bound "in fairness" to inform him of the New York proceedings before his Arizona plea was entered and that this is ground for reversal of this conviction. However, Holder cites no authority for the imposition of such a duty on the government except in cases where the government, during negotiations, has made explicit or implicit representations concerning investigations of other offenses in other jurisdictions. Holder concedes that no such representations were made in this case. Under these circumstances due process does not require that his plea in one court preclude his later indictment on other charges in another jurisdiction. *See United States v. Papa,* 533 F.2d 815, 823–25 (2d Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976).

Holder's second claim concerns the sealing of the indictment for 13 months. During this period the government apparently tried to locate the four indicted parties who, unlike Holder and Johnson, were not incarcerated and thus easy to find. Fed.R.Crim.P. 6(e) authorizes sealing of an indictment in such circumstances. Two of those indicted had still not been located when the government proceeded to trial against Holder, Lyles, Johnson and Dunham.

Holder argues that until the indictment was unsealed the government failed to abide by section 11 of the Eastern District's transitional plan for the prompt disposition of criminal cases, which provides that if the United States Attorney knows a person charged with a criminal offense to be imprisoned, he must undertake to obtain the presence of the prisoner for plea and trial or to have a detainer filed. But the plan itself does not require dismissal even in clear cases of section 11 violations. Section 10(e) of the plan provides that except for failure by the government to be ready for trial within six months (from the filing *or unsealing* of an indictment) noncompliance with the plan's time limits does not require dismissal. *See Eastern District Transitional Plan Pursuant to the Provisions of the Speedy Trial Act of 1974* §§ 6A, 10(c), and 10(e) (emphasis added).

Holder argues that even if the plan itself does not provide for dismissal, the 13 month sealing of the indictment was violative of his due process rights and thus dismissal of the indictment is called for on constitutional grounds. He relies on *United States v. Heckler,* 428 F.Supp. 269 (S.D.N.Y.1976) and *United States v. Sherwood,* 38 F.R.D. 14 (D.Conn.1964), in which indictments were dismissed because of unreasonable delay in their unsealing. Both *Heckler* and *Sherwood,* however, turned in large part on two distinguishing facts: the statute of limitations had run before the indictment was unsealed, and for most (or all) of the period of the

The judgments of conviction are affirmed.

sealing, all defendants were available for trial. In the absence of similar factors or any showing that Holder was substantially prejudiced by the timing of the proceedings below, we cannot hold that the district judge abused his authority under Fed.R.Crim.P. 6(e) or that Holder's right to a fair trial was infringed.